**UNITED STATES of America, Appellee,**

v.

**Manuel RODRIGUEZ, a/k/a Manolo Rodriguez, Appellant.**

**No. 500, Docket 75–1287.**

United States Court of Appeals, Second Circuit.

Argued Nov. 28, 1975.

Decided March 11, 1976.

Anthony F. Correri, Mineola, N. Y., for appellant.

Paul F. Corcoran, Asst. U. S. Atty., E. D. N. Y., Albany, N. Y. (David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for appellee.

Before LUMBARD, FRIENDLY and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

On July 18, 1975, after trial to a jury in the District Court for the Eastern District of New York, appellant Manuel Rodriguez was judged guilty, fined, and sentenced on four counts of a twelve count indictment for harboring illegal aliens in violation of 8 U.S.C. § 1324(a)(3). Although a number of points have been raised, the only one requiring discussion is the serious claim that pivotal prosecution testimony should have been suppressed as the fruit of an illegal search.

Neil Jacobs, a criminal investigator for the Immigration and Naturalization Service (INS), testified, both at a suppression hearing and at trial, in regard to the entry, on February 12, 1975, into two houses owned by Rodriguez in Levittown on Long Island, one at 18 Bunting Lane, the entry relevant here, and the other at 113 Brittle Lane. The INS' interest in these houses had its source in an interview with one Ortilia Vilatoro, an alien who had been arrested on July 23, 1974 for being illegally in this country; she told the INS she was living at 113 Brittle Lane, had lived at 18 Bunting Lane, and had seen two or three other illegal aliens living in these houses. The interest thus created was revived in January, 1975, when Ernesto Lopez, who had been convicted for conspiring to harbor aliens, see *United States v. Lopez,* 521 F.2d 437 (2 Cir. 1975), *cert. denied,* 423 U.S. 995, 96 S.Ct. 421, 46 L.Ed.2d 368, 44 U.S. L.W. 3330 (1975), told Agent Jacobs that illegal aliens were living in two houses in Levittown owned by "Manolo Martinez." Jacobs obtained authority from his superior to have agents go to the houses "to sit on the house and observe . . . if someone walked out of the house just to ask them where they were from." His purpose, as found by the district court, was to arrest aliens residing in the houses who were unlawfully in the United States, not to procure evidence to support a criminal charge against the owner. Three agents accompanied him to 18 Bunting Lane.

As events developed, extended surveillance was not required. Immediately upon arriving at 18 Bunting Lane around 7:00 a. m., Jacobs noticed a male of "Hispanic" appearance seated in an "old" car which was parked in front of the suspect house. Jacobs approached the man, subsequently identified as Jorge Galaes, and, having informed Galaes of his official status, inquired of Galaes in Spanish as to his alienage and authority to be in the country. Galaes responded that he had entered the United States from El Salvador as a tourist in 1969 and that "he came in with a passport." When Jacobs asked to see the passport, Galaes indicated that it was inside the house. Jacobs apparently then considered Galaes to be under arrest; he would not have permitted Galaes to enter the house alone. However,

> I did not tell the alien he was under arrest. It was sort of implied. I did not actually come out and say "You are under arrest." I said, "You will have to come down to the office." I didn't handcuff him and drag him out. I just said, "I would like to have your passport."

Later Jacobs phrased the last remark as "Let's get your passport." And, at another point in the suppression hearing, he answered as follows:

> And you then directed him to get the passport?
>
> Yes.
>
> And you directed him into the house?
>
> Yes.

Galaes did not tell Jacobs to wait outside, nor did he object to Jacobs' accompanying him. The three other investigators followed Jacobs into the house, although at least the last one did not enter for a few minutes.

Upon coming into the house, Jacobs was immediately in the kitchen; he there encountered Alba Rivas, who, upon being asked the same questions as had been put to Galaes, gave her name, said she was from Honduras, had entered as a tourist in 1972, and had a passport. Ms. Rivas and Mr. Galaes were placed under arrest. Agent Jacobs then asked Ms. Rivas for her passport and accompanied her to her bedroom while she was getting it; another agent went along, while a third remained in the living room to guard Galaes. In the bedroom they encountered another male. Upon being questioned by Jacobs, "He told me his name was Jose Caballero. He said he was from El Salvador. I asked him how he entered the United States. I believe he told me he paid somebody off to take him over the border." Mr. Caballero was then arrested. Having obtained Ms. Rivas' passport, the group left the room.

Another bedroom was directly opposite; Jacobs knocked on the door; a man opened it. Upon questioning, this man said he was from El Salvador, "and I believe he said he was smuggled in." Hearing breathing, Jacobs then looked under the bed and saw a female; she said she was from El Salvador and had paid someone to smuggle her in.

Before Jacobs and his partner had returned to the living room with these newly-found aliens, the fourth agent had entered the house, had found out that Galaes and Rivas had been arrested, and had proceeded upstairs. He there discovered three more aliens; Jacobs' testimony as to the circumstances of these arrests was sketchy. A ninth illegal alien was discovered by Jacobs when he, too, went upstairs and looked into a storage area with a flashlight. Finally, a tenth such alien was caught as he drove up in a stationwagon.

■ Each of the arrested aliens was then interviewed at INS headquarters in Manhattan and each was found to be illegally in the United States. The cumulative import of their statements was to provide evidence of appellant's knowledge of the unlawful status of those whom he was sheltering, which evidence was a prerequisite for conviction under 8 U.S.C. § 1324(a)(3), *United States v. Lopez, supra.* On February 13, 1975, an indictment was returned against Rodriguez by a grand jury in the Eastern District. Shortly thereafter, appellant, as owner of 18 Bunting Lane, moved to suppress any evidence resulting from the allegedly unconstitutional search of the house. The motion encompassed, among other matters, the prospective testimony of the aliens discovered as a result of the allegedly unlawful activity, see *United States v. Tane,* 329 F.2d 848 (2 Cir. 1964); *United States v. Karathanos,* 531 F.2d 26 (2 Cir. 1976).

The motion to suppress was denied by Judge Platt on March 25, 1975, following a three-day hearing at which Agent Jacobs was the only witness who testified regarding the episode at 18 Bunting Lane. The district court reasoned, in part, that since INS officers had probable cause to arrest Jorge Galaes after questioning him outside the house, they had derivative authority to order him to retrieve his passport and to accompany him when he returned to the house to obtain it. The court allowed the Government to put on the stand eight of the aliens residing at 18 Bunting Lane, and to introduce other evidence showing the number and illegal status of persons there found. While we agree with so much of the court's reasoning as we have recited, we think it insufficient to justify admission of all this evidence.

■ Apart from the recent decision of a divided panel in *United States v. Karathanos, supra,* we should have thought that in light of the distinction with respect to information given by an actual witness to or participant in a crime, made in *United States v. Miley,* 513 F.2d 1191, 1204 (2 Cir. 1975), cert. denied, 423 U.S. 842, 96 S.Ct. 74, 75, 46 L.Ed.2d 62 (1975), and *United States v. Burke,* 517 F.2d 377, 380–81 (2 Cir. 1975), and the many cases from other circuits there cited, the combination of information given by Vilatoro and its updating by Lopez would have brought the Government within striking range of probable cause to obtain a search warrant al-

though not quite there. Be that as it may, this information was surely enough, along with the agent's expertise, to justify Jacobs' questioning Galaes under 8 U.S.C. § 1357(a)(1), see *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, 616 (1975). Galaes then answered that he had entered the United States as a "tourist" six years previously. While it would have been better if Agent Jacobs had followed up with a question whether Galaes had done anything to regularize his status, Jacobs could reasonably assume that Galaes would have mentioned this if he had done so. Probable cause to arrest exists when an officer has knowledge of facts and circumstances "sufficient to warrant a prudent man in believing" that an offense is being, or has been, committed, *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145 (1964), and does not require the arresting officer to know of facts sufficient to prove guilt at trial, *Draper v. United States,* 358 U.S. 307, 311–12, 79 S.Ct. 329, 331–333, 3 L.Ed.2d 327, 330–331 (1959). Accordingly, an officer need not be able to negate all possible lawful explanations of a situation before making an arrest, *Adams v. Williams,* 407 U.S. 143, 148–49, 92 S.Ct. 1921, 1924–1925, 32 L.Ed.2d 612, 618–619 (1972). There was thus probable cause for Galaes' arrest under 8 U.S.C. § 1357(a)(2).

This conclusion, however, does not of itself establish that Agent Jacobs was justified in accompanying Galaes into the house. There was no evidence that Galaes invited Jacobs to enter and the Government stipulated at trial that "there was no consent to search." There was equally no evidence that Galaes proffered any objection. More importantly, as we view the evidence we do not think that Jacobs was conducting a search when he entered the dwelling.

█ Jacobs testified that securing an alien's passport is a "basic" procedure since "it's difficult to move a person out of the country without a passport." While that may somewhat overstate the case, it seems clear that his interest in Galaes' passport was not to procure evidence of guilt but to facilitate deportation; Galaes knew that the jig was up so far as staying in this country was concerned. Doubtless thinking that the best he could do was to escape prosecution, Galaes was willing to produce the passport, and Agent Jacobs could not allow him to enter the house alone to get it because of the risk that he might escape. We know of no principle of Fourth Amendment law that would forbid Jacobs who had made (or was in a position to make) a lawful arrest from maintaining custody of Galaes during a peaceful entry into the house where Galaes lived while the latter found his passport. Jacobs was thus properly in the house.[1]

█ Jacobs then encountered Alba Rivas. He clearly had sufficient grounds for questioning her. His brief interrogation for the purpose of determining her identity and alienage seems to fit comfortably within the limits authorized by *Terry v. Ohio,* 392 U.S. 1, 22–23, 88 S.Ct. 1868, 1880–1881, 20 L.Ed.2d 889, 906–907 (1968); *Adams v. Williams, supra,* 407 U.S. at 145–46, 92 S.Ct. at 1922–1923, 32 L.Ed.2d at 616–617; and

---

1. Although the dissent points to a footnote on p. 15 of the Government's brief saying that "the purpose [of the entry] was to seek out bodies, lawfully subject to arrest, which the agents had probable cause to believe inside," the main theme of the brief is sounded on p. 13:

> Agent Jacobs, then having reason to believe Galaes an illegal alien, was justified in requesting Galaes' passport both to substantiate his claims and to allow prompt deportation, if applicable. Since he could not reasonably permit the suspected illegal aliens to enter the house alone; his entry with Galaes to obtain his passport was both reasonable and good police work. (Citation omitted.)

> His subsequent encounter of Rivas and Caballero was fortuitous,** and his inquiries concerning their alienage and deportability was at that time, based upon "reasonable suspicion", if not "probable cause", to believe that they too were illegal aliens. Jacobs entry into the premises with Galaes was therefore for a legitimate purpose, and that which transpired thereafter followed logically.

> ** Jacobs testified that had he not encountered Rivas on entering the house, he did not know whether he would have searched further.

*United States v. Brignoni-Ponce, supra,* 422 U.S. at 880–82, 95 S.Ct. at 2579, 2581, 45 L.Ed.2d at 615–617. While these cases, and almost all of those that have relied on them, involved confrontations which may be said to have taken place in public surroundings, any additional requirement in the instant case (if one exists) arising from the fact that, from Ms. Rivas' standpoint, Jacobs was an uninvited intruder into her residence would be satisfied by the further "cause" furnished by the interrogation of Galaes and an analogy to the cases upholding "plain view" seizures of evidence. Here, as there, the courts should not require law enforcement officials to ignore what is plainly, and legitimately, before them. Given the evidence which Jacobs already had, and the obvious propriety of the questions he asked, we do not think that his questioning of Ms. Rivas was anything but reasonable under the circumstances. Her subsequent arrest and the maintenance of custody while she went to procure her passport were lawful, for the same reasons indicated with respect to Galaes; the same principles also justify the interrogation and arrest of Caballero.

■ It can be argued against our holding of the lawfulness of Jacobs' activity up to this point that the subsequent conduct of him and the other agents, and the fact that Jacobs was followed into the house by them, demonstrate that his purpose from the outset was to search the house for illegal aliens from bottom to top. Cf. *United States v. Lisznyai,* 470 F.2d 707 (2 Cir. 1972), *cert. denied,* 410 U.S. 987, 93 S.Ct. 1516, 36 L.Ed.2d 184 (1973); *United States v. Artieri,* 491 F.2d 440, 442–43 (2 Cir.), *cert. denied sub nom. Gonzales v. United States,* 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 670 (1974). The defendant asks us, as he asked the trial court, to draw that conclusion, but we are not required to view the evidence in that light. It is not clear how many agents accompanied Jacobs on his entry; he surely would have been entitled to have someone accompany him to protect his safety. It is just as reasonable to conclude that it was the lawful discovery that 18 Bunting Lane housed more than one alien illegally in the

United States which triggered the decision to make a complete search of the house, and Jacobs' testimony, although not as distinct as might be desired, tends to that conclusion.

■ With the arrest of Caballero, however, the chain of justification ends. Jacobs testified that the purposes for searching the rest of the house were to ensure the agents' safety and to see if there were any other illegal aliens living there. Apart from the question whether the agents exceeded their statutory authority, see 8 U.S.C. § 1357(a)(3), this sounds much like the argument made in dissent by Mr. Justice White (joined by Mr. Justice Black) in *Chimel v. California,* 395 U.S. 752, 773–75, 89 S.Ct. 2034, 2045–2047, 23 L.Ed.2d 685, 700–701 (1969), and rejected by the majority. We read that decision as requiring that, after Caballero's arrest, Jacobs and the other agents were required to do as best they could to maintain custody of the aliens lawfully arrested and surveillance of the house while a search warrant was being obtained.

Although the conviction must be reversed because of the admission of evidence with respect to the search of the house subsequent to Caballero's arrest, the testimony relating to the first three aliens would suffice to sustain a guilty verdict if a jury at a new trial should return one. We shall therefore not dismiss the indictment, as appellant asks, but remand for a new trial in which the Government will be limited to evidence lawfully obtained.

LUMBARD, Circuit Judge (dissenting):

I agree that the conviction of Manuel Rodriguez for harboring illegal aliens must be reversed. However, there is no basis whatsoever for distinguishing between the initial entry into 18 Bunting Lane and the subsequent search of the premises. Both to me were equally and plainly unconstitutional. Accordingly, I would remand to the district court with directions to dismiss appellant's indictment which rested upon, and now must fall with, the unlawful entry. In its zeal to preserve a portion of the govern-

ment's case for retrial, the majority has, in my view, significantly eroded the Fourth Amendment's guarantee against unreasonable searches.

Nothing which transpired during the sidewalk conversation between Jacobs and Galaes furnished justification for the agents' decision to enter 18 Bunting Lane and then to proceed as if some judicial officer had issued a search warrant. The majority's reference to Galaes' supposed "willingness" to produce his passport is misleading and irrelevant. As an appellate court we are not at liberty simply to ignore the stipulation of' the Assistant United States Attorney during the suppression hearing that "there was no consent to search."

Moreover, even assuming, arguendo, that the agents had probable cause to arrest Galaes while still on the street, the custody they say they then exercised over him gave them no derivative right to direct that he lead them into the house. To grant to the INS such extensive powers would totally subvert the Supreme Court's decision in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which limited the right to search incident to an arrest to those areas within the control or reach of the person apprehended. See also, *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970) (an arrest on the street in front of the defendant's home does not create its own exigent circumstances justifying the search of his house).

While it may seem that because one thing leads to another it was therefore natural and reasonable for the agents to go into the house with Galaes, once there to talk to others whom they encountered and then to conclude that those persons were also illegal aliens, the net result here is one which the Constitution as construed by the Supreme Court has long and categorically condemned. Until now no case has held that an agent seeking evidence can, without a

search warrant, open the door of a home, walk in, and then seize whatever else confronts his eyes and serves his needs. Nor is there any case which lends authority to the proposition that our jealously guarded prohibitions against casual entry of private dwellings are relaxed because an alien thought to be here illegally is arrested outside a house in which he has left his "passport." I thus see no significance in the majority's claim that Jacobs and his fellow agents entered 18 Bunting Lane with the single intention of procuring Galaes' passport. The assertion is, in any event, belied by the admission of the INS itself that "the purpose of the [warrantless entry] was to seek out bodies."[1]

The court's opinion seems to me to reduce to the novel contention that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches . . ." may be sacrificed with impunity so long as the intrusion is motivated by a desire to obtain evidence for deportation rather than for prosecution. I strongly disagree.

Despite the contrary, unsupported assumption of the majority, the Fourth Amendment is not limited in its protection to those accused of criminal behavior. See *Camara v. Municipal Court*, 387 U.S. 523, 530, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930, 936 (1967). Our responsibility as its guarantor cannot therefore be fulfilled with the simple, albeit accurate observation that deportation is not a penal sanction, Cf. *Lennon v. INS*, 527 F.2d 187, at 193 (2d Cir. 1975). The one critical question, which the court artfully avoids answering is by what authority did the INS agents require Jorge Galaes to retrieve his passport and then accompany him when he returned to the house to obtain it? That their directive was issued in the context of an administrative investigation may be relevant in determining the quantum of probable cause necessary to support a search warrant,[2] see *Ca-*

---

1. Government's brief at page 15, note.

2. The Court in *Almeida-Sanchez* was divided, and left undecided, whether a diminished stan-

dard of probable cause was appropriate in the context of enforcement efforts to halt the ever increasing tide of illegal aliens into this country, 413 U.S. at 270, n. 3, 93 S.Ct. at 2538, 37

*mara,* supra; *See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); it cannot, however, absent exceptional circumstances not revealed here, excuse their total failure even to attempt to secure the prior approval of a disinterested magistrate before entering the dwelling.

Certainly immigration authorities face a difficult task in attempting to stem the tide of illegal aliens crossing our nation's borders in ever increasing numbers. Nevertheless, the applicability of the Warrant Clause to their efforts can no longer be doubted following the Supreme Court's decision in *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1972). In declining to uphold the warrantless search of an automobile at a point more than 100 miles from Mexico, Mr. Justice Stewart, writing for the majority, stressed the need to circumscribe the unfettered discretion of the officer in the field, 413 U.S. at 270, 93 S.Ct. at 2538, 37 L.Ed.2d at 601. If anything, that need is more manifest in this case given the greater protection which the constitution affords to a home than to a car, see *Chambers v. Maroney,* 399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419, 426 (1970).

The government, to its credit, belatedly recognized what the majority today so nonchalantly overlooks. In an effort to justify their earlier neglect to procure a search warrant, the INS has argued on appeal that the possibility that several illegal aliens would escape as soon as they were alerted to the federal presence constituted exigent circumstances necessitating immediate action. This contention is, however, flawed, insofar as it is premised upon the agents first being in the house. There is nothing in the record which would even remotely suggest that any of the inhabitants of 18 Bunting Lane were aware of the conversation on the street between Jacobs and Galaes. It is at that point, prior to entering the house, that one of the agents could have and should have been dispatched to obtain a search warrant. See *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). Their failure to do so is fatal.

For the above reasons, a remand now would be an exercise in futility. Eliminating all the evidence which flowed from the unlawful entry by the INS, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), at best what would remain is the testimony of Galaes who, we are informed, is no longer in the country. Moreover, the garbled recollection of Jacobs as to when Galaes was "impliedly arrested," where he was "formally arrested," and what precisely is the difference between these two metaphysical states, convinces me that the proper course is simply to recognize that the entire prosecution was irremediably tainted and order that the indictment be dismissed.

---

L.Ed.2d at 601. We similarly have no need to pass on that question since the INS never took the preliminary step of appearing before a magistrate and presenting their evidence. I thus note only in passing the recent comment of Chief Judge Kaufman that the severity of deportation "surpasses all but the most Draconian of criminal penalties. *Lennon v. INS,* at 1193.