**Pascual MENDOZA, et al.**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, et al.**

No. EP–82–CA–76.

United States District Court,
W.D. Texas,
El Paso Division.

May 17, 1982.
On Motion to Clarify June 9, 1982.

Albert Armendariz, Jr., Jesus B. Ochoa, Antonio Cortez, Edwardo Gamboa, Luis C. Jarmillo, Mario Martinez and Lawrence J. Augustine, El Paso, Tex., for plaintiffs.

Jerry Tanzy, Asst. U.S. Atty., Gary A. Reaves, Asst. City Atty., El Paso, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER FOR INJUNCTIVE RELIEF

BUNTON, District Judge.

On March 29 and 30, 1982, the parties presented evidence concerning Plaintiffs' demand for a Preliminary Injunction. After extensive review of the relevant authorities and considerable reflection on the competing interests of the parties and the social implications of any remedy fashioned by the Court, it has been determined that Plaintiffs are entitled to a Preliminary Injunction for the reasons outlined below.

### I. THE FACTS

Most of the salient facts are undisputed. Early in 1982, the Immigration and Naturalization Service (INS) received information from the El Paso Police Department (EPPD) that illegal aliens were employed in certain bars throughout the City of El Paso. A list of bars was compiled, and the INS developed a plan for an "area control operation" by which the named bars were to be raided on a given evening. This was a city-wide operation, and several establishments were hit simultaneously throughout the evening of January 29, 1982. El Paso police officers accompanied INS agents to the establishments and assisted in detentions, arrests, and possibly interrogation. The credible testimony established that the EPPD was involved in the January 29 raid solely for the purpose of keeping the peace

and protecting the INS from unruly conduct by those encountered in the establishments; it is not clear, however, what role the police officers played in the detention and interrogation of individuals. In the course of the evening, the INS raided Montana Village Lounge, El Retiro No. 2 and the Martinique Club in a section of El Paso frequented mainly by persons of Mexican descent.

At each establishment, several INS agents, accompanied by several EPPD officers, burst unannounced, without warrant and without valid consent, into the bars, stopped the music, guarded the doors so that it was apparent to those inside the bar that no one could leave without permission of the officers, stopped bar service, made the patrons be seated or line up against the wall, randomly interrogated both patrons and employees in the bars as to their citizenship, concentrated on those of obvious Mexican descent, and searched other (sometimes private) areas of the establishments.

Roberto Luna, an American citizen, was arrested at El Retiro. He produced valid documents establishing his citizenship, but the interrogating agent discredited their authenticity since Luna spoke no English. Luna was arrested and detained for four hours.

At Montana Village, Pascual Mendoza, an El Paso fireman and American citizen, was interrogated concerning his citizenship. Mendoza was highly offended by the interrogation and refused to cooperate. INS agents escorted him to the street where two police officers arrested him for drunk and disorderly conduct and drove him to the police station. He was not booked and no criminal proceedings were initiated as a result of the arrest.

Luna and Mendoza claim that the INS agents violated their Fourth Amendment right to be secure in their persons and their Fourteenth Amendment right to equal protection of the law, alleging that the INS agents picked on them because of their obvious Mexican descent. Mendoza further claims that the INS and EPPD conspired to deprive him of these rights.

Bar owners Luna and Castaneda claimed that the INS and EPPD conspired to deprive them, Mexican-American owners of public establishments patronized primarily by people of Mexican descent, of their right to do business without unjustified and oppressive government interference, and of their right to equal protection of the law. They claim that their businesses suffered money damages from the intrusion on January 29 and from similar intrusions on subsequent days.

All Plaintiffs state their claims under 42 U.S.C. § 1983, asking for declaratory and injunctive relief as well as money damages.

## II.  PRELIMINARY INJUNCTION

The question before the Court at this juncture is whether Plaintiffs are entitled to a Preliminary Injunction. The four prerequisites to a Preliminary Injunction are:

  (1) Plaintiffs' likelihood of success on the merits,

  (2) threat of irreparable injury,

  (3) the Plaintiffs' interest in obtaining the injunctive relief outweighs the harm to Defendants if the relief is granted, and

  (4) the public interest is not disserved by granting injunctive relief.

*Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).

### A.  The Merits

The legal issues presented are: (1) whether warrants were required before the INS could enter and search the respective bars, detain and interrogate patrons and employees; (2) whether the constitutional rights of Roberto Luna and Pascual Mendoza were violated by their arrests, and (3) whether Defendants INS and EPPD conspired to deny Plaintiffs equal protection of the law.

1.  *Were warrants necessary to detain and interrogate persons in the bars or to search the premises?*

Since it is obvious that all Defendants acted under color of state law when they did the acts complained of in this lawsuit,

the first and greatest hurdle in this dispute is to determine whether the INS and/or the EPPD violated any of the Plaintiffs' constitutional rights by entering the bars in force without warrant or consent, detaining everyone in the bars and interrogating many as to their citizenship.

■ The Fourth Amendment furnishes every individual the right to be secure in his person; that is, to be free from unreasonable searches or seizures, including brief detentions short of traditional arrest. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also U.S. v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). A person has been "seized" for purposes of the Fourth Amendment when it becomes clear to him that a law enforcement officer has restrained his liberty to move about by means of physical force or a show of authority. A person is not seized, however, when he voluntarily cooperates with the authorities and retains his freedom to walk away. *Terry,* 392 U.S. at 16, 88 S.Ct. at 1877; *Yam Sang Kwai v. INS,* 411 F.2d 683 (D.C.Cir.1969).

■ It is clear from the evidence that anyone who was in the three named bars on January 29, 1982, was "seized" and that no one consented to such seizure. It is also clear that Robert Luna and Pascual Mendoza were arrested although, ostensibly, Mendoza was not arrested for violation of the immigration laws; he was, however, forcibly detained for possible violation of the immigration laws.

■ Now the Court must determine whether such "seizures" were reasonable. Reasonableness depends on a balance of the public interest and an individual's right to personal security free from arbitrary interference by law officers. *Terry,* 392 U.S. at 20–21, 88 S.Ct. at 1879. The general requirement for a reasonable seizure is probable cause. *U.S. v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). An INS agent has the power to seize a person when he reasonably believes that the person is an alien illegally present in the U.S.

■ The Supreme Court has ruled several times on the constitutionality of detention in the border area: a roving patrol cannot constitutionally stop and search for aliens in a vehicle found 25 miles north of the Mexican Border, based simply on the fact that the car was in the general vicinity of the border, unless the driver consented or there was a warrant to search or probable cause to believe that the vehicle contained illegal aliens. *Almeida-Sanchez v. U.S.,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

Also, a roving patrol may stop a vehicle for brief investigation as to the citizenship of the occupants, where the intrusion is modest, based on specific articulable facts, and rational inferences from those facts that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country. *Brignoni-Ponce,* 422 U.S. at 884, 95 S.Ct. at 2581 (1975).

In each case, the Court has limited the search or seizure powers by weighing the need for their exercise against individuals' Fourth Amendment interests in privacy and personal security. *See also U.S. v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) and *U.S. v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

■ It should be noted here that vehicular cases presume exigent circumstances; that is, even if an officer had knowledge that a vehicle contained illegal aliens, he would lose the vehicle if he took the time to secure a warrant. *Carroll v. U.S.,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The same exigencies are not present where the suspects are employees who work in a building; they can reasonably be predicted to return and their egress and ingress can be monitored. Clearly, there are no exigent circumstances where the INS received reports concerning illegal aliens weeks earlier than the raids. Absent exigent circumstances, an officer must obtain either consent or a warrant or have a reasonable suspicion that criminal activity is afoot before he may detain a suspect. The INS proved no exigent circumstances.

■ The INS claims that it was given statutory authority to enter, detain and interrogate without warrant. It is true that Congress empowered INS agents to act without warrant to enforce the immigration laws in the following situations: (1) to interrogate any person believed to be an alien as to his right to be in the United States and (2) to arrest any alien reasonably believed to be in the United States illegally *if* the alien is likely to escape before an arrest warrant can be obtained. 8 U.S.C. § 1357(a)(1) and (2). These provisions, however, must be construed to be consistent with the requirements of the Fourth Amendment, for Congress cannot statutorily create exceptions to Constitutional Amendments. *Almeida-Sanchez v. U.S.,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

The statute does not specifically address the power of INS agents to enter places of business to conduct searches without warrant, unless "private lands" of Subsection 3 of § 1357 can be construed to be a commercial place of business. That section allows INS agents to have access to "private lands" for the purpose of patrolling the border to prevent the illegal entry of aliens into the country.

■ For guidance, the Court has reviewed cases involving administrative inspections of places of business which claimed Fourth Amendment protections: *Donovan v. Dewey,* 452 U.S. 903, 101 S.Ct. 3027, 69 L.Ed.2d 403 (1981); *Marshall v. Barlow's,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *U.S. v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering v. U.S.,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); *See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); and *Camara v. San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). *See also Blackie's House of Beef v. Castillo,* 659 F.2d 1211 (D.C.Cir.1981). These cases must not be read as imposing a less rigid standard for search of a public or commercial enterprise. Rather, they are consistent with other Fourth Amendment cases which require either consent or probable cause to search, but they focus on the consent question. They stand for the proposition that there can be no reasonable expectation of privacy from administrative searches or inspections where the business voluntarily participated in a regulated industry. Such participation is deemed to be consent to administrative searches or inspections. Where the regulations give insufficient notice of the extent of the search or where the search otherwise exceeds the scope of the search which is reasonably expected, there can be no implied consent, and the Fourth Amendment requires a warrant.

■ The bars in question were not regulated by the INS. The occupants of the bars had no reason to believe that they were subject to the kind of investigative detention or search which occurred on January 29, 1982; on the other hand, the bar owner admitted that it was not unusual for INS or EPPD officers to be present in the bar. The Court finds that the occupants of the bars had no reasonable expectation of privacy insofar as the presence of the officers in the bar was concerned. Therefore, the officers did not need a warrant merely to enter the premises. They did, however, need a warrant to search in the manner in which they searched the non-public areas and to detain the occupants of the bars since the nature of their search required detention of people as to whom they had no individualized reasonable suspicion of illegal alienage.

■ Absent consent, an INS agent may not even detain and interrogate a person believed to be an alien unless the agent has a reasonable suspicion based on articulable facts and rational inferences that the person not only is an alien but is illegally in the country. *U.S. v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Au Yi Lau v. INS,* 445 F.2d 217, *cert. denied,* 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971); *Marquez v. Kiley,* 436 F.Supp. 100 (S.D.N.Y. 1977); *Illinois Migrant Council v. Pilliod,* 548 F.2d 715 (7th Cir.1977); *and especially Illinois Migrant Council v. Pilliod,* 531 F.Supp. 1011 (N.D.Ill.1982). This proposi-

848

tion is supported by several Supreme Court cases concerning other areas of criminal law which require suspicion of criminal activity before an investigatory stop can be made. *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); and *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

■ The INS claims that it had a reasonable suspicion, based on information provided by the EPPD earlier in the month that illegal aliens were present in the bars raided on January 29. The information supplied to the INS by the EPPD was rather vague as to who was illegal, how many were to be found in each establishment, their physical or job characteristics, etc., and certainly of dubious validity since weeks lapsed from the time of the report to the time of the raids. There was no evidence that INS agents were looking for specific people when they entered the bars or that their search was in any way related to specific information received from the EPPD. *See Babula v. INS,* 665 F.2d 293, 296 (3rd Cir.1981) (tip concerning employment of illegal aliens combined with indicia of actual employment justified minimally intrusive interrogation). Furthermore, by using the dragnet method of detention, INS agents did not limit their detention and interrogation to those individuals reasonably suspected of being aliens illegally present in the country; individuals who could not have been reasonably suspected were also detained.

In *Steagald v. U.S.,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the Supreme Court made it clear that, even though officers had probable cause to arrest specific individuals, they could not violate others' Fourth Amendment rights in order to effect that arrest.

■ Section 1357 and the Fourth Amendment do not sanction random detention; rather, detention of an individual must be based on an officer's reasonable suspicion that that particular individual is engaged in criminal activity—in this case, is an alien illegally in the country—and the detention is solely for the purpose of inquiring further as to that alien's status. *See Martinez-Fuerte,* 428 U.S. at 560–61, 96 S.Ct. at 3084; *Terry,* 392 U.S. at 21, n. 18, 88 S.Ct. at 1880, n. 18; *Babula,* 665 F.2d at 297; *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *U.S. v. Brennan,* 538 F.2d 711 (5th Cir.1976); *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); and *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). It is offensive to the Court's sense of justice that any one of us could have been caught in one of the indiscriminately thrown dragnets in El Paso on January 29 while enjoying mariachi music and tostados. Furthermore, as noted above, courts have thoroughly discussed the parameters of border detentions without notice of warrant in the cases concerning permanent checkpoints and roving patrols. The critical factor is and always has been the amount of interference with individual liberty that results from an investigatory stop. The courts have determined that the intrusion is permissible when officer's discretion is minimized where detention is routine and brief, and especially where there is ample notice and knowledge of the purpose of the stop. *U.S. v. Martinez-Fuerte,* 428 U.S. 543, 557–60, 96 S.Ct. 3074, 3082–84, 49 L.Ed.2d 1116 (1976).

Only where the dragnet is carefully aimed and thrown can detention be limited to those as to whom officers reasonably suspect illegal activity. The INS did not show that its aim was at all careful or discriminate. Therefore, the method used to detain and interrogate those present in the three bars was constitutionally impermissible. *See U.S. v. Rodriguez,* 532 F.2d 834 (2d Cir.1976) (where house was used to harbor aliens, INS agents were justified in questioning to determine alienage and to maintain surveillance of house while search warrant was obtained, but not in searching house from top to bottom).

■ The illegal detention was impermissible for the further reason that the stop

and inquiry must be reasonably related in scope to the justification for the stop and inquiry. *Terry v. Ohio,* 392 U.S. at 29, 88 S.Ct. at 1884. If an officer suspected that an alien was illegally present in the country, he could inquire as to his alien status and any suspicious circumstances, but further detention must be based on consent or probable cause. The INS agents did not show that they had even a reason to suspect—much less probable cause to believe—that each individual detained was an illegal alien, nor did they show that any of the individuals caught in the dragnet consented to the detention.

The two bar owners claim that the INS deprived them of their Fourteenth Amendment liberty interest to conduct business without oppressive or unreasonable governmental interference by raiding their bars without warrant or consent. Under the Fourth Amendment analysis set out above, the INS' detention of all the occupants in each bar was unreasonable. It is easy to see how this raiding technique was effective in flushing out illegal aliens. The problem lies with the intrusion into the lives of people who are involved in no wrongdoing. The bar owners' uncontroverted testimony was that their business was disrupted, their patrons were upset and angry, and Jesus Luna consequently lost business.

■ The bar owners cannot directly complain that their patrons' Fourth Amendment rights were violated, but they may complain when such violation caused the owners direct harm, such as unreasonable interference with business, which Luna and Castaneda have shown. The bar owners have also shown that the INS violated their Fourth Amendment rights by searching non-public areas of their bars. Castaneda testified that officers entered the bathrooms, his private office and a storage area. The INS offered no proof of exigent circumstances or reasonable suspicion that illegal aliens were present in those non-public areas, although common sense dictates that the only way such raids could be effective would be for the INS agents to search all areas on the premises. Since searches of non-public areas could and should have been foreseen, the INS should have obtained warrants before conducting the dragnet raids and searches on January 29. Based on the facts presented at the hearing, the Plaintiff bar owners are likely to prevail on the merits at trial.

2. *Were the constitutional rights of RO-BERTO LUNA and PASCUAL MEN-DOZA violated by their arrests?*

The general requirement for making an arrest is that the officer have probable cause to believe that an offense has been committed by the person to be arrested. This is a stricter test than for investigatory detention.

The INS agents only had authority to arrest persons reasonably believed to be illegal aliens who were likely to escape before an arrest warrant could be obtained. 8 U.S.C. § 1357(a)(2). Again, the enforcement interests must be weighed against the two individuals' rights to freedom from oppressive governmental intrusion and to be secure in their persons, and any detention after the investigatory stop must be based on consent or probable cause. *Brignoni-Ponce,* 422 U.S. at 882, 95 S.Ct. at 2580.

■ Roberto Luna presented valid documents of citizenship. The INS agent reasonably discredited their authenticity because of Luna's inability to speak English. The agent was told, however, that Luna could not speak English because he was reared in Juarez, which is right across the border from El Paso. In addition, it could have been determined that he at least understood English and that he was, in fact, the son of the owner of the bar and the cousin of the man who did try to explain to the agent that Luna was a citizen. With this information, the presumption should have shifted back in Luna's favor that the documents were valid, and Luna should not have been arrested.

As for Mendoza, it is clear that he was forcibly detained for interrogation until he was delivered into the custody of the

EPPD. He was not arrested by the INS, but it is not clear that the INS did not intend to pursue its interrogation of him while he was in the custody of the Police Department. Defense counsel intimated during Mendoza's cross-examination that an INS agent in plain clothes had been seated next to Mendoza at the bar listening to his conversation and, based on that conversation, determined that Mendoza was an alien and/or illegally in the country. Apparently, when the uniformed agents raided the bar, the plain clothes agent signaled other agents to interrogate Mendoza. Defendants did not establish, however, by anything other than negative implication in oral argument of counsel, that there was reasonable suspicion of alienage or illegal presence in the country. The evidence presented at the hearing was inconclusive as to the constitutionality of Mendoza's arrest.

3. *Did Defendants INS and EPPD conspire to deny Plaintiffs of equal protection under the law?*

It is undisputed that the impact of area control operations, dragnet detentions, and individualized interrogations concerning alien status would adversely impact the Mexican-American community anywhere in El Paso. Naturally, since the large majority of illegal aliens expected to be found in El Paso would be from Mexico, a suspect's apparent Mexican descent would be an important factor in formulating a reasonable suspicion at least as to alienage. The bars were patronized mainly by Mexican-American citizens, but the bar owners were not denied equal protection simply because their bars and their patrons were subjected to scrutiny by the INS agents. Plaintiffs Mendoza and Roberto Luna complain that they were interrogated more vigorously than others and arrested solely because of their apparent Mexican descent, but the Court finds that their detention and interrogation were based not solely on their heritage but on additional reasonable circumstances.

No evidence presented even suggested that the INS and EPPD formulated their plan for the area control operation for the purpose of denying any Mexican-American equal protection of the laws. Discriminatory intent must be shown to recover for denial of equal protection. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Discriminatory intent has not been shown; therefore, Plaintiffs are not likely to succeed in the merits of their equal protection claim.

B. *Irreparable Injury*

Where constitutional rights have been violated and are threatened to be violated again, money damages are not an adequate remedy. Since the Court has found that Plaintiffs' constitutional rights were violated, there is ample evidence to support Plaintiffs' fear that they will again be violated, the Plaintiffs are entitled to injunctive relief as to dragnet searches and interrogation.

C. *Balancing of Interest*

The government's interest in enforcing the immigration laws is certainly compelling, especially in these days of economic recession and high unemployment, but that interest is circumscribed by the Fourth and Fourteenth Amendments.

The government would obviously like to continue its raids, which have proved effective in detecting the presence of illegal aliens. This interest, however, must bend constitutional restrictions on law enforcement practices. *Steagald v. U.S.,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). In this case, the balance is in Plaintiffs' favor; Plaintiffs were citizens innocent of any wrongdoing, and the government oppressively and wrongfully intruded into their privacy and the privacy of other bar occupants. *See Brignoni-Ponce,* 422 U.S. at 882–3, 95 S.Ct. at 2580–81.

D. *Public Interest*

To allow INS agents to stop and interrogate persons based solely on suspicion of alienage would allow the INS to stop and interrogate more than half of the legitimate population of the border town of

El Paso. This would be a subversion of the public's Fourth Amendment right to be secure in their persons and Fourteenth Amendment right to be free from unwarranted and oppressive governmental intrusion into its privacy. It is clear in this case that the innocent public's interest is not disserved by granting injunctive relief to Plaintiffs. *See Brignoni-Ponce,* 422 U.S. at 883–4, 95 S.Ct. at 2581.

## III. ORDER OF INJUNCTIVE RELIEF

Based on the above findings and conclusions, the Court hereby ENJOINS the INS from conducting warrantless dragnet searches and seizures such as were conducted on the evening of January 29, 1982. Further, INS agents are ENJOINED from detaining to investigate the alien status of any individual as to whom the agent has no reasonable suspicion that the individual is illegally in the country. Also, INS agents are ENJOINED from arresting persons as to whom the agent does not reasonably believe the person is illegally in the country. The Court further ENJOINS the INS from searching non-public areas of commercial premises without a warrant.

This case poignantly illustrates the tension between the need for law enforcement and individuals' constitutional rights; the law enforcement technique was very effective, but it infringed the rights of innocent bystanders. Chief Justice Burger commented on this tension in *U.S. v. Ortiz:*

> As the Fourth Amendment now has been interpreted by the [Supreme] Court it seems that the Immigration and Naturalization Service is powerless to stop the tide of illegal aliens ... that daily and freely crosses our 2,000-mile southern boundary. Perhaps these decisions will be seen in perspective as but another example of a society seemingly impotent to deal with massive lawlessness. In that sense history may view us as prisoners of our own traditional and appropriate concern for individual rights, unable—or unwilling—to apply the concept of reasonableness explicit in the Fourth Amendment in order to develop a rational ac-

commodation between those rights and the literal safety of the country.

422 U.S. 891, 899, 95 S.Ct. 2585, 2590, 45 L.Ed.2d 623 (1975). The Court, however, is more hopeful and confident that the INS will prove resourceful in developing strategies to inhibit the growth of illegal alien population in the United States. This Preliminary Injunction hopefully will not serve to discourage the INS from performing their duties but will encourage them to be more mindful of the parameters of individuals' constitutional rights while performing their duties.

## ON MOTION TO CLARIFY

Came on to be heard this date Defendants' and Plaintiffs' Motion to Clarify, and the Court responds as follows:

The government has asked the Court to declare that 8 U.S.C. § 1357 allows INS agents to stop and question any person believed to be an alien. Plaintiffs have also asked the Court to clarify its Order as it affects the INS agents' right to stop persons.

The Court holds that § 1357 does not confer unlimited authority to stop and question a person just because the person is believed to be an alien. INS agents have the right under § 1357 to approach a person believed to be an alien and ask questions, so long as the agent does not restrain the person and the person stopped is free to walk away. *See U.S. v. Setzer,* 654 F.2d 354 at 357 (5th Cir.1981) and *U.S. v. Elmore,* 595 F.2d 1036 at 1042 (5th Cir.1979). When a person believes that his freedom to walk away has been restrained, his Fourth Amendment rights come into play, and the agent has no right to further restrain him unless he has a reasonable suspicion that the person is illegally in the country.

The critical question in determining the extent of the agent's authority to stop and question a person is whether the person stopped reasonably believes he has been restrained. This is a fact question which can be determined only on a case-by-case basis. (For example, if the person is approached in a manner which is threatening or intimidat-

ing, the stop may amount to a seizure.) *See U.S. v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

■ The government has also asked the Court to clarify the circumstances under which non-public areas of commercial premises may be searched without warrant. The law is clear that such premises may be searched where consent has been given or where exigent circumstances are present. This was not discussed in the Court's previous order since agents had neither consent nor exigent circumstances when searching the premises.

Also, the government is granted an extension of 14 days in which to file its Notice of Appeal.

Plaintiffs have requested the Court to modify its Order to enjoin the INS from acting in concert, cooperation or participation with any other law enforcement agency. Facts supporting this request were not before the Court at the hearing on the Preliminary Injunction and cannot be disposed of at this procedural juncture. Further injunctive relief can only be granted after an adversarial proceeding—either a hearing or a trial on the merits. The evidence presented at the hearing on preliminary injunctive relief did not convince the Court that the El Paso police officers were engaged in the impermissible detentions. At trial, if convinced otherwise, an injunction to desist from such activity, whether in concert with the INS or not, may well issue and damages be awarded.

Plaintiffs also ask the Court to clarify the authority of INS agents to enter commercial premises when they have no reasonable suspicion that aliens are illegally on the premises. The Court holds that INS agents have the same right to enter the premises that any other person has. Repeated entry, without reasonable suspicion of illegal activity within, may eventually amount to an unreasonable search, however. The Court declines to amend the Order to enjoin unreasonable, repeated entry since the facts pled by Plaintiffs in their Motion to Clarify were not before the Court and subject to the government's cross-examination at the hearing on preliminary injunctive relief.

Hopefully, this response to the Motions for Clarification will adequately illustrate this Court's perception of the law as it controls this case.