# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1535

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Jose E. Castellanos, also known as | * | |
| Jose Navarrete, also known as | * | |
| Pescado, also known as Fish, | * | |
| also known as Lujan Guillermo, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 13, 2007
Filed: March 12, 2008

_____

Before RILEY, BOWMAN, and SMITH, Circuit Judges.

_____

RILEY, Circuit Judge.

Jose E. Castellanos (Castellanos) appeals the district court's denial of his motion to suppress. We affirm, in part, and reverse, in part.

## I.    BACKGROUND

The following relevant facts pertaining to the search of Castellanos's residence are uncontroverted. Law enforcement officers went to Castellanos's residence, a trailer, after receiving information from a confidential informant and other sources

that Castellanos was in this country illegally, was selling a large quantity of drugs from his residence, and had a cousin who had been kidnaped and killed. Upon arrival at about 6:15 in the morning, the officers found the door to Castellanos's residence partially open. The officers knocked on the door, but no one answered. Neighbors reported no traffic in or out of the trailer for about a week. Because the officers had information concerning a possible kidnaping offense and murder offense, the officers entered the residence to verify the welfare of the occupants. Finding no one inside, the officers left the residence. The record indicates the officers initially went to the trailer with the intent to obtain consent to search the residence. As the officers were leaving, they observed Castellanos driving a pick-up truck into the residence's parking lot, but then driving away after seeing the officers.

The officers followed Castellanos for two blocks before stopping Castellanos for weaving. Special Agent Tracy Raggs (Agent Raggs) of the Immigration and Customs Enforcement Office (ICE) conducted the traffic stop. Detective Luis Ortiz (Detective Ortiz), who was also present, stated Castellanos was "pretty drunk," stumbled out of the truck and had urinated on himself. At first, Castellanos refused to give his name and said "Just arrest me." Castellanos eventually identified himself as Guillermo Lujan, but he did not have identification with him. Castellanos stated his identification was at home. Detective Ortiz testified he requested consent to search Castellanos's home and vehicle, but Castellanos did not reply. Detective Ortiz did not push the consent issue because Castellanos was so intoxicated. When questioned about this specific incident, Detective Ortiz's testimony was as follows:

> Q. Okay. So, your best guess is more than likely you had a conversation about identification first?
> A. Correct.
> Q. And at some point while you were discussing ID, you did request consent to search the residence?
> A. Yes, it through [sic] me off because I didn't expect him to be that drunk at 6:00 in the morning.

Q. All right. And his response to your request was no response?
A. It was no response.
Q. And based on his lack of response, you concluded he was too drunk to consent?
A. Correct.

The officers handcuffed Castellanos and transported him back to his residence to verify his identity. The officers testified Castellanos was never placed under arrest and handcuffs were placed on Castellanos as part of the police department's policy.

The record is not clear as to when the officers removed the handcuffs from Castellanos. However, it is undisputed: (1) Castellanos opened the unlocked door of his residence and entered; (2) Agent Raggs and Detective Ortiz followed Castellanos inside; and (3) Castellanos did not object to the officers entering the residence with him.

Once inside the residence, Castellanos sat down on a couch in the living room. Agent Raggs asked Castellanos for the location of his identification, but Castellanos did not answer. Agent Raggs specifically described the encounter in the living room as follows:

Q. And was he told to sit down on the couch?
A. He just kind of had a seat on his own.
Q. Okay. Is it fair to say he was still being uncooperative?
A. Yeah, he wasn't answering the question of who he was. He wouldn't give his name.
. . . .
Q. Well, at what point did Detective Ortiz request consent to search the trailer?
A. After he wouldn't give his name, Detective Ortiz told him again why he was there. He told him he had information that he was selling drugs, and that he had guns and stuff like that. And asked him could he have consent. He told him that it was an ongoing investigation. He asked

could he have consent. And the defendant asked him did he have a warrant. Detective Ortiz said no. Then he said no.

Q. Okay. So, the defendant actually said no, you can't search the residence?

A. Yeah, he said he wouldn't give consent.

After Castellanos refused to consent to the search of his residence, Agent Raggs testified he asked Castellanos again for his identification and Castellanos "kind of flipped his hand" in the direction of his bedroom. Agent Raggs entered Castellanos's bedroom and searched a dresser and a chest of drawers, but did not find Castellanos's identification. Agent Raggs, however, saw a notebook with other papers on top of the dresser. The notebook had monetary figures written on it. Agent Raggs saw similar papers in the living room, including a paper taped to the wall with names, numbers, and monetary figures. The officers eventually noticed a wallet on a bookshelf next to Castellanos. The officers retrieved identification from the wallet bearing the name of Guillermo Lujan. Agent Raggs testified he asked Castellanos if Guillermo Lujan was his name and Castellanos repeatedly responded, "what's on the ID?" Agent Raggs also asked Castellanos about his immigration status, and Castellanos replied he was in the country illegally.

Detective Ortiz decided to apply for a search warrant because Castellanos "was too intoxicated to consent to a search of his residence." During the execution of the search warrant, the officers found evidence of drug dealing, approximately $60,000 in cash and a receipt for a storage unit. The officers also found approximately $1,800 in cash on Castellanos. The officers searched Castellanos's truck and found two .9mm magazines and two pistols.

The officers subsequently located Teresa Wilkerson (Wilkerson), the name listed on the storage locker receipt. Wilkerson stated she had rented the storage locker for Castellanos and Castellanos had paid the rental fee. The officers asked Wilkerson for her consent to search the storage locker because Wilkerson's name was the only

name on the receipt for the locker. Wilkerson consented. In the storage locker, the officers found a stolen vehicle containing eight packages of methamphetamine.

Castellanos was charged with, among other things, possessing and conspiring to distribute methamphetamine, illegal reentry, and possessing firearms and ammunition while being in the United States illegally, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A), 8 U.S.C. § 1326(a), 18 U.S.C. §§ 922(g)(5) and 924(a)(2). Claiming the search warrant was based on an unreasonable search of the residence, Castellanos filed a motion to suppress. The district court, based on the magistrate judge's report and recommendation, granted the motion to suppress with respect to the search of the truck, but denied the motion in all other respects. The government did not object to the report and recommendation regarding the suppression of the items found in the truck. Castellanos then entered a conditional guilty plea to conspiracy to distribute 500 grams or more of methamphetamine, reserving his right to appeal the denial of his motion to suppress. Castellanos was sentenced to 135 months imprisonment, and now appeals the denial of his motion to suppress the evidence found inside his residence.

## II.    DISCUSSION

"Reviewing denial of a motion to suppress, this court examines for clear error the district court's factual findings, and we review de novo the ultimate question whether the Fourth Amendment has been violated." United States v. Varner, 481 F.3d 569, 571 (8th Cir. 2007) (quotation and citation omitted). We "must affirm an order denying a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." Id. (citation omitted). The "Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-

delineated exceptions." Horton v. California, 496 U.S. 128, 133 n.4 (1990) (citations omitted). "The Fourth Amendment generally prohibits police from entering a home without a warrant unless the circumstances fit an established exception to the warrant requirement." Varner, 481 F.3d at 571 (citation omitted). We review a Fourth Amendment challenge for reasonableness. See Illinois v. McArthur, 531 U.S. 326, 330 (2001).

"An individual may validly consent to an otherwise impermissible search if, in the totality of the circumstances, consent is freely and voluntarily given, and not the product of implicit or explicit coercion." United States v. Rambo, 789 F.2d 1289, 1296 (8th Cir. 1986) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973)). "[T]he mere fact that one has taken drugs, or is intoxicated, or mentally agitated, does not render consent involuntary." Id. at 1297 (citations omitted). "In each case, the question is one of mental awareness so that the act of consent was the consensual act of one who knew what he was doing and had reasonable appreciation of the nature and significance of his actions." Id. (quotation and citation omitted).

The government contends the district court properly denied Castellanos's motion to suppress the evidence in his residence because the district court correctly found the officers lawfully entered Castellanos's residence and Castellanos impliedly consented to the officers' search of his bedroom for his identification. We disagree in part. A fundamental flaw exists in the government's position that Castellanos consented to the search of the bedroom. The record indicates the officers failed twice to obtain consent from Castellanos to search his home. The first attempt occurred at the traffic stop. Castellanos did not respond, and Detective Ortiz did not push the issue because Castellanos was too intoxicated.

The second attempt occurred in Castellanos's living room. Agent Raggs testified Detective Ortiz asked Castellanos for consent to search his home. Castellanos asked if the officers had a warrant. When told no warrant existed,

Castellanos refused consent to a search. It is clear from the record Castellanos never expressly authorized the officers' search of the residence or entry into his bedroom.

Keeping in mind "[t]he precise question is not whether [Castellanos] consented, but whether his conduct would have caused a reasonable person to believe that he consented," United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001) (citation omitted), we agree with the government that the record indicates the officers reasonably believed Castellanos did not object to the officers following him into the living room. Under the totality of the circumstances, the officers' entry into the residence's living room was reasonable. However, allowing an officer to enter one's home and allowing the officer to search the home are two very different matters. When a person permits an officer to enter the person's home, the officer does not have free reign to wander around the home and search any area of the house, without further consent. Indeed, Castellanos expressly refused consent to search his residence.

Consent to search can be inferred from gestures and other conduct. See Jones, 254 F.3d at 695. However, in this case, the officers admittedly believed Castellanos, who was not under arrest, "was too intoxicated to consent to a search of his residence." The record shows Detective Ortiz requested a search warrant for the residence because Castellanos was too inebriated to consent. Detective Ortiz's testimony as to Castellanos's condition is not internally inconsistent and was not contradicted by objective evidence. If Castellanos's intoxication was such that the officers believed Castellanos was incapable of giving consent to a search, it must follow that Castellanos did not possess the capacity to give implied consent. Under the facts of this case, it is simply not reasonable for the officers to infer Castellanos impliedly consented to their entry into his bedroom when Castellanos "kind of flipped his hand" in that direction.

The government contends that, under our decision in <u>Rambo</u>, the officers' search of Castellanos's bedroom was proper.[1]  However, <u>Rambo</u> is distinguishable from the case at hand because, unlike Castellanos's case, the defendant in <u>Rambo</u> had been evicted from his dwelling (a hotel room) and had no standing to challenge the search.  Based upon this fact, we stated:

> Rambo was asked to leave the hotel by the officers, acting at the request of and on behalf of the hotel manager, because of his disorderly behavior. . . . Rambo was justifiably ejected from the hotel . . . and the rental period therefore had terminated. . . . At that time, control over the hotel room reverted to the management.  Rambo no longer had a reasonable expectation of privacy in the hotel room, and therefore is now without standing to contest the officers' entry (search) into the hotel room.  Rambo cannot assert an expectation of being free from police intrusion upon his solitude and privacy in a place from which he has been justifiably expelled.

<u>Rambo</u>, 789 F.2d at 1295-96 (citations and footnote reference omitted).  Furthermore, in <u>Rambo</u>, the record did not reflect the officers perceived defendant was too

---

[1]The government also cites other cases to support its position.  However, the cases cited by the government are easily distinguishable because, unlike Castellanos's case, the defendants explicitly granted permission to search the room in question, and there was no question the defendants possessed the mental capacity to consent to the search.  In some cases, the defendants had been placed under arrest or the incriminating evidence was visible as soon as the officers entered the defendant's home.  See <u>United States v. Willie</u>, 462 F.3d 892, 895-96 (8th Cir. 2006); <u>United States v. Gipp</u>, 147 F.3d 680, 684, 686 (8th Cir. 1998); <u>United States v. Turbyfill</u>, 525 F.2d 57, 58-9 (8th Cir. 1975).  The government also cites <u>United States v. Winston</u>, 444 F.3d 115, 118-19 (1st Cir. 2006), but in that case, a protective sweep of the premises had to be conducted because the officers had information defendant was armed and dangerous, possibly with armed and dangerous cohorts, and defendant had been previously arrested by one of the officers for possession of a handgun.  The government further cites <u>United States v. Wagner</u>, 884 F.2d 1090, 1094 (8th Cir. 1989), but in that case we found the officers obtained search warrants before the search in question.

intoxicated to give consent. Rambo "responded coherently and rationally to the officers' requests for identification, and voluntarily directed them to his luggage," which was located in the same room with the defendant. Id. at 1297.

The government also relies on United States v. Rodriguez, 532 F.2d 834 (2d Cir. 1976) to persuade us the search of Castellanos's bedroom was proper. However, Rodriguez is also distinguishable because: (1) the mental capacity of the tenant defendants was never in question, (2) the tenants were under arrest before the officers entered their bedrooms, and (3) once the tenants were arrested, the officers followed them into their bedrooms where the tenants, not the officers, retrieved their identifications (passports). Id. at 836-37. The court concluded that maintaining custody of the tenants who were under arrest and accompanying the tenants to their bedrooms so they would procure their identification did not constitute a search. Id. at 838-39. In contrast, Castellanos's mental capacity to consent to a search of his residence was unquestionably compromised, he was not under arrest, and he never entered his bedroom or moved from his living room couch—Agent Raggs entered the bedroom alone.

The government further contends 8 U.S.C. § 1357, which applies to the immigration service, made the search of Castellanos's bedroom proper. In particular, the government points to the following language:

> Any officer or employee of the Service authorized and designated under regulations prescribed by the Attorney General, whether individually or as one of a class, shall have power to conduct a search, without a warrant, of the person, and of the personal effects in the possession of *any person seeking admission to the United States*, concerning whom such officer or employee may have reasonable cause to suspect that grounds exist for denial of admission to the United States under this chapter which would be disclosed by such search.

8 U.S.C. § 1357(c) (emphasis added). The search language of this statute pertains to circumstances where individuals are attempting to enter the United States, and is not

-9-

authorization for the immigration service to conduct warrantless searches of homes. Section (a)(3) of this same statute specifically prohibits a search of a "dwelling" without a warrant.

> (a) Powers without warrant
>
> Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have the power without warrant—
>
> (3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, *but not dwellings*, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States . . . .

8 U.S.C. § 1357(a)(3) (emphasis added).

Contrary to the government's position, 8 U.S.C. § 1357 does not relax the Fourth Amendment prohibition against warrantless entry into private dwellings.[2] The

_____

[2]Arguing the contrary, the government cites United States v. Nevarez-Alcantar, 495 F.2d 678, 679 (10th Cir. 1974). Nevarez-Alcantar is distinguishable for three reasons: (1) it does not involve the search of a home, (2) the defendant was under arrest, and (3) the interview of the defendant and search of his briefcase took place at the border patrol's office. The government also cites United States v. Villa-Velazquez, 282 F.3d 553, 556 (8th Cir. 2002) and United States v. Roche-Martinez, 467 F.3d 591, 593-94 (7th Cir. 2006), but these cases are also distinguishable. In both cases, the officers had confirmed before they encountered the defendant that the defendant returned illegally to this country after having been previously deported, the defendant was placed under arrest, the mental capacity of the defendant was never in question, the officers never searched the home where they arrested the defendant, and the suppression issue was whether the district court erred in failing to suppress defendant's identity when the defendant was held at the jail or under arrest.

Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. These rights are among the rights held "more sacred." See Terry v. Ohio, 392 U.S. 1, 9 (1968) (citation omitted).

The testimony of Detective Ortiz that Castellanos was too intoxicated to consent to a search is undisputed. The facts surrounding the search of the bedroom are undisputed, and we are not disturbing the district court's findings either of fact or credibility. However, we find the district court's holding that Castellanos, in his diminished capacity, impliedly consented to the search of his bedroom is not fairly supported by the record and is an erroneous application of the law. As a result, the evidence seized during the unlawful search of Castellanos's bedroom must be suppressed. See Murray v. United States, 487 U.S. 533, 536-37 (1988).

## III.   CONCLUSION

Based on the foregoing, the district court's denial of Castellanos's motion to suppress is reversed with respect to the evidence seized from Castellanos's bedroom, but the district court's ruling is affirmed in all other respects. The case is remanded to the district court for further proceedings consistent with this opinion.

_____