# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 07-2905

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Randall Lee Comstock, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: April 15, 2008
Filed: July 8, 2008

_____

Before GRUENDER, BALDOCK,[1] and BENTON, Circuit Judges.

_____

BALDOCK, Circuit Judge.

---

[1] The Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation.

A jury in the Southern District of Iowa found Defendant Randall Lee Comstock guilty of being a felon, and drug user, in possession of firearms and ammunition. See 18 U.S.C. §§ 922(g)(1), (g)(3); id. § 924(a)(2). The district court imposed a 180 month term of imprisonment. On appeal, Defendant challenges the district court's[2] denial of his motion to suppress evidence seized during authorities' warrantless search of his residence, as well as the district court's decision to sentence him under the Armed Career Criminal Act. See 18 U.S.C. § 924(e)(1). We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and affirm.

I.

On May 5, 2006, authorities conducted a warrantless search of Defendant's home and detached garage. Officials seized, among other things, the firearms and ammunition that gave rise to the underlying charges. The parties' respective accounts of how Defendant and his wife, Jessica Comstock, came to give written consent to authorities' search diverge at certain points. Nevertheless, except where otherwise noted, the facts are uncontested.

This case arose in connection to a West Des Moines Police Department (WDMPD) burglary investigation. On April 30, 2006, perpetrator(s) broke into Corn States Metal, a West Des Moines business, and stole approximately $80,000 in property, including a variety of metal fabrication equipment and a Chevrolet pickup truck. WDMPD's investigation revealed that Randy DePhillips was selling the equipment stolen from the burglary. Accordingly, WDMPD Detective Daniel Paulson made arrangements to purchase, in an undercover capacity, a welding tool from DePhillips. On May 5, 2006, Detective Paulson met DePhillips at a Des Moines area residence and purchased a stolen Cornstates Metal welder for $1000, using pre-

---

[2] The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa.

marked police funds.  During the transaction, DePhillips indicated he could sell Detective Paulson additional Cornstates Metal tools.  He stated that, although the other items were with someone "down south," he could get them to Des Moines if the detective was interested.  Later, DePhillips said he would try to make the arrangements within the hour.  When he left Detective Paulson, WDMPD surveillance followed DePhillips, but briefly lost sight of him near the intersection of Northwest 52nd and Lovington streets.  Defendant lived five or six houses south of that intersection, on Northwest 52nd Street.

WDMPD officers regained contact with DePhillips a short time later.  Police followed him as he traveled north on Northwest 52nd Street, turned east onto Lovington Street, and returned to his place of business.  After the surveillance team monitored DePhillips for a short time, Detective Paulson approached, identified himself, read DePhillips his Miranda[3] rights, and asked if DePhillips would speak with him.  DePhillips agreed.  Detective Paulson asked DePhillips for the $1000.  DePhillips denied having the cash, saying he delivered the $1000 to Defendant at his home.  He explained that he was selling items stolen from Corn States Metal for Defendant.  DePhillips denied knowing who burgled Corn States Metal.  When asked by Detective Paulson if anyone else was present when he dropped off the $1000, DePhillips said Dave, the person from "down south" storing additional tools stolen from Corn States Metal, was at Defendant's house.  DePhillips described Dave's vehicle as a station wagon or small minivan.  After speaking with DePhillips, WDMPD officers decided to do a "knock and talk" at Defendant's residence.  Detective Paulson testified that, had the "knock and talk" proved unsuccessful, WDMPD officers were prepared to write a search warrant for [Defendant's] residence.

Detective Paulson, Detective Lloyd Carlson, and Officer Kelly Griffith went to Defendant's Northwest 52nd Street residence.  As the officers approached the

---

[3]  See Miranda v. Arizona, 384 U.S. 436 (1966).

property, they noticed numerous vehicles parked in the vicinity of Defendant's home. Two cars were parked in Defendant's driveway, a van-like vehicle was parked in the driveway of the abandoned residence immediately north of Defendant's house, and numerous parked vehicles congested the street in front of Defendant's residence. Detective Paulson testified that at least one matched DePhillips' description of the vehicle driven by Dave (*i.e.*, from "down south"). Accordingly, Detective Paulson believed multiple individuals could be inside Defendant's house.

Detective Paulson knocked on the door and displayed his WDMPD badge when Defendant answered. The detective told Defendant that WDMPD was investigating a case involving stolen property. He said he knew Randy DePhillips just delivered $1000 to Defendant, and that he wanted WDMPD's cash back. Detective Paulson told Defendant that he was not under arrest and asked Defendant if he would speak with him. Defendant agreed and invited the officers into his home. The three WDMPD officers entered and spoke with Defendant in the front room, immediately adjoining the front door. Before sitting down, Detective Paulson asked Defendant if he had the $1000. Defendant said yes, and that he obtained the money from DePhillips. Defendant retrieved the cash from his pocket. Detective Paulson briefly inspected the bills' serial numbers, which matched the $1000 he gave DePhillips for the welder.

The three officers proceeded to interview Defendant about the stolen property and the Corn States Metal burglary. During this conversation Detective Carlson, asked Defendant if anyone else was in the house. Defendant said no. When Detective Carlson asked whether he could search the residence to verify as much, Defendant agreed. Detective Carlson testified that he made the request for officer safety purposes. Detective Carlson and Office Griffith proceeded to sweep the house, entering a bedroom off the living room, the kitchen, and then the basement via a kitchen stairwell. Detectives Paulson described Defendant's demeanor throughout the sweep as being very relaxed, docile, cooperative, and complacent. Detectives Paulson

and Carlson testified that Defendant never objected to the officers' protective sweep, nor attempted to limit, qualify, or revoke his consent thereto. Conversely, Defendant testified that the officers never asked whether they could conduct a protective sweep. Further, he testified that, when Detective Carlson headed towards the basement, he signaled his objection by saying "hey."

In any event, a short time after Detective Carlson and Office Griffith entered the basement, they returned and informed Detective Paulson they found a marijuana grow operation in the basement. At that point, approximately 8:00 p.m., Detective Paulson handcuffed Defendant (with his arms behind his back), advised him of his Miranda rights, and summoned narcotics officers to respond. Detective Paulson told Defendant that, while he did not want to discuss the drugs, he would like to continue their conversation about the stolen property, while awaiting the narcotics team's arrival. Defendant agreed and proceeded to make several admissions concerning the burglary, including that the vehicle stolen from Corn States Metal was the Chevrolet truck in his driveway and that other stolen items were in his garage. Detective Paulson testified that a fence obstructed his view of the truck when he approached the house and, therefore, he had not recognized the truck as the vehicle stolen from Corn States Metal until Defendant's admission.

Thereafter, Jessica Comstock and a friend arrived at the Comstock residence. When informed that officers had found the grow operation, Mrs. Comstock responded by saying it was for personal use and they had no intention of selling the marijuana. She also denied knowing that the Chevrolet truck was stolen. Detective Paulson described Mrs. Comstock's demeanor towards the officers as being very docile and cooperative, though she seemed irritated to learn that the Corn States Metal truck and tools were stolen. Throughout this interval, Defendant remained handcuffed. Officers did, however, remove the handcuffs to allow Defendant to use the restroom. They also briefly removed the handcuffs so Defendant could put on a shirt.

Additionally, at some point, Mrs. Comstock asked to turn on the heat (which required flipping the breaker switch located in the basement). The police acceded and Detective Carlson accompanied her to the basement. According to Mrs. Comstock, when Detective Carlson accompanied her downstairs, he asked her about the object located to the left of the breaker box. In response, Mrs. Comstock testified that she entered the combination (which she indicated that she alone had) and opened the gun safe so the detective could look inside. Mrs. Comstock further stated that after looking in the safe, Detective Carlson closed, without locking, the safe, directed her to go back upstairs, and exited the basement behind her. Notably, Detective Carlson testified that the aforementioned events concerning the gun safe never occurred.

Sometime after Defendant admitted to Detective Paulson that he had other stolen items in his garage, Detective Paulson testified that Defendant gave him permission to get the tools, as well as specific instructions on where to find them. After trying unsuccessfully to locate the items, Detective Paulson had Mrs. Comstock accompany him to the garage and, with her assistance, retrieved the tools. Aside from these efforts, Detective Paulson testified that he did not search the garage or the residence. Conversely, Defendant testified that he had not given Detective Paulson express consent to fetch the tools from the garage. Further, Defendant maintained that the officers searched his residence from the time they handcuffed him, until the narcotics team arrived nearly two hours later.

The Mid-Iowa Narcotics Enforcement Task Force (the narcotics officers or the narcotics team) arrived at the Comstock residence at approximately 10:00 p.m. The WDMPD officers briefed the narcotics team and then, evidently, directed them downstairs to see the marijuana grow. Before seizing anything from the residence, a narcotics officer asked Defendant and Mrs. Comstock to sign a standard consent-to-search form. Both Defendant and Mrs. Comstock signed, indicating they authorized police to search their residence, including the garage, without any limitations. They also initialed next to the following statement: "no promises, threats, force, or coercion

of any kind have been used to gain my consent to the above describe search or to have me sign this form." At least five police officers were on the premises when the Comstocks signed the search forms.[4] Thereafter, narcotics officers searched the property and seized the firearms charged in the underlying indictment.

Narcotics officers apparently viewed the marijuana plants in the basement before seeking consent to search from Defendant or Mrs. Comstock, but did not seize anything until after obtaining consent.[5] Neither Detective Paulson, nor Detective Carlson, testified in detail about what the narcotics officers said when requesting Defendant and Mrs. Comstock to sign the consent forms. Both Defendant and Mrs. Comstock testified that officers told them that refusing to consent would require officers to obtain a search warrant from a judge, which would mean waiting several hours longer. The Comstocks stated that they signed the consent forms to expedite the process, and because officers had already been through the house several times by that time. Defendant also emphasized that the handcuffs hurt his wrists and arms, and that officers' statements — *i.e.*, that he would remain at the house in handcuffs for "another couple of hours" if they had to get a search warrant — impacted his decision to sign. Defendant and Mrs. Comstock respectively denied being under the influence of alcohol, drugs, or otherwise being impaired on the night in question. Additionally, Mrs. Comstock testified that narcotics officers not only viewed the marijuana grow, but also entered the detached garage before seeking consent to search. She further asserted that police individually took her and Defendant to a back room where they

---

[4] How many narcotics officers responded to the Comstock residence is unclear. The written consent forms demonstrate that at least two narcotics officers were present. Thus, coupled with the three WDMPD officers, a minimum of five officers were on the premises when the Comstocks signed the forms.

[5] To be clear, Defendant does not contend that the narcotics team's viewing of the marijuana grow when they first arrived on the scene — *i.e.*, *before* they presented Defendant and Mrs. Comstock with the consent-to-search forms — constituted an unlawful search. Accordingly, we express no opinion on the matter.

were questioned before being presented with consent-to-search forms. By contrast, Detective Paulson testified that the narcotics officers asked the Comstocks to consent in a hallway just off the living room and that he witnessed them sign the forms.

In advance of trial, Defendant moved to suppress all evidence — namely the three firearms and ammunition charged in the underlying Indictment — seized by authorities pursuant to their two warrantless searches of his home on May 5, 2006. Defendant argued that police officers carried out the warrantless searches of his residence without probable cause, exigent circumstances, or consent. Alternatively, Defendant maintained police exceeded the scope of any consent he tendered.

Ruling from the bench, the district court found, as to the officers' protective sweep: (1) Defendant voluntarily admitted the officers into his home; (2) Defendant voluntarily consented to officers' protective sweep of the house; (3) Defendant did nothing to limit, qualify, or withdraw that consent; (4) the officers had a legitimate concern that other persons could be in the house, given the number of vehicles parked in the immediate vicinity of Defendant's residence; (5) officers' entry into the basement and discovery of the marijuana grow, which prompted authorities to take Defendant into custody, was within the scope of Defendant's consent to the protective sweep; and (6) authorities had probable cause to arrest Defendant no later than the point at which they discovered the marijuana grow, and likely at the time Defendant produced the $1000 cash. Regarding the search of Defendant's residence following the narcotics team's arrival, the district court ruled — without making detailed findings — that Defendant and his wife voluntarily and effectively executed the consent-to-search forms. Accordingly, the district court ruled that police had not violated Defendant's Fourth Amendment rights and denied his motion to suppress. The case proceeded to trial and a jury convicted Defendant of being a felon and drug user in possession of firearms and ammunition. See 18 U.S.C. §§ 922(g)(1), (g)(3), 924(a)(2).

In advance of sentencing, the Presentence Report (PSR) calculated Defendant's recommended Guidelines range to be 188-235 months, with a total offense level of 33 and a criminal history category of IV. Therein, the PSR found Defendant subject to the Armed Career Criminal Act (ACCA) because he had "three previous convictions . . . for a violent felony or a serious drug offense, or both." See 18 U.S.C. § 924(e)(1). According to the PSR, Defendant had six prior convictions that qualified as predicate ACCA offenses: (1) felony delivery of cocaine; (2) felony distribution of narcotics; (3) operating a motor vehicle while intoxicated (OWI), second offense; (4) attempted burglary; (5) OWI, third offense; and (6) operating a motor vehicle without the owner's consent. Accordingly, the PSR applied the ACCA's fifteen year (180 month) sentencing enhancement. Defendant only objected to the application of the ACCA on the grounds that his prior convictions for "operating a vehicle under the influence" (OWI) in violation of Iowa law fell outside the ACCA's definition of "violent felony." See 18 U.S.C. § 924(e)(2)(A). At sentencing, the district court agreed that the applicable, advisory Sentencing Guidelines range was 188-235 months, but, pursuant to the 18 U.S.C. § 3553(a) factors, imposed the ACCA's 180 month mandatory minimum sentence.

## II.

Defendant first argues that the district court erred in denying his motion to suppress. See U.S. Const. amend. IV. Specifically, Defendant asserts that authorities' warrantless protective sweep of his home, as well as the warrantless search carried out after Defendant and Mrs. Comstock gave written consent to the narcotics officers, violated his Fourth Amendment rights. As such, Defendant insists any evidence derived therefrom must be suppressed and that the district court committed clear error in concluding otherwise. In response, the Government maintains Defendant waived his right to challenge the district court's suppression ruling.

At trial, each time the Government moved to admit evidence that Defendant's pretrial motion sought to suppress (namely, the firearms and ammunition seized from Defendant's home), defense counsel stated "no objection." "Normally the denial of a pretrial motion to suppress evidence preserves the objection for appeal and defense counsel need not renew the objection at trial." United States v. Johnson, 906 F.2d 1285, 1290 (8th Cir. 1990); accord Lawn v. United States, 355 U.S. 339, 353 (1958) (denial of suppression motion by the trial court generally "preserves the point and renders it unnecessary again to object when such evidence is offered at trial"). Yet, this Court has "found pretrial objections waived when an appellant's counsel *affirmatively stated* 'no objection' at trial to the admission of evidence previously sought to be suppressed." United States v. Gonzalez-Rodriguez, 239 F.3d 948, 951 (8th Cir. 2001) (emphasis added); Johnson, 906 F.2d at 1290. This is precisely what occurred here. As such, we hold Defendant "consciously and intentionally waived any objection" to the district court's receipt of the evidence at issue in his pretrial suppression motion. United States v. Wedelstedt, 589 F.2d 339, 345-46 (8th Cir. 1978).

In any event, reviewing the district court's factual determinations for clear error and its legal conclusions de novo, Defendant's position is unavailing. See United States v. Esquivel, 507 F.3d 1154, 1158 (8th Cir. 2007); Gonzalez-Rodriguez, 239 F.3d at 951 (pronouncing an alternative holding on the merits, after finding suppression issue waived). Under the Fourth Amendment, "searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. United States, 445 U.S. 573, 586 (1980). Equally fundamental, however, is the principle that a warrantless search of a residence does not violate the Fourth Amendment where police obtain a resident's consent.[6] See Schneckloth v. Bustamonte, 412 U.S. 218,

---

[6]  For clarity's sake, we note that Defendant does not challenge the voluntariness of Mrs. Comstock's consent. In any event, we need not reach this issue because we ultimately conclude that Defendant voluntarily consented to authorities'

(continued...)

219 (1973). We "must affirm an order denying a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." United States v. Castellanos, 518 F.3d 965, 969 (8th Cir. 2008). Therein, the fact "[t]his court is highly deferential to district court credibility determinations" bears underscoring. United States v. Williams, 521 F.3d 902, 908 (8th Cir. 2008).

Regarding the protective sweep, Defendant does not dispute he consented when officers asked if they could verify that no one else was in the house. Rather, Defendant maintains that the protective sweep exceeded the scope of his consent when officers searched the house beyond the area immediately around the front room where Defendant and the officers were seated. "We measure the scope of consent to search by a standard of objective reasonableness." United States v. Siwek, 453 F.3d 1079, 1085 (8th Cir. 2006). That is, "what the 'typical reasonable person would have understood by the exchange between the officer and the suspect.'" Id. (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)).

Notably, the district court credited the officers' consistent testimony that Defendant did not limit, qualify, or attempt to revoke his consent to the protective sweep. "A credibility determination made by a district court after a hearing on the

---

(...continued)
search. See United States v. Hudspeth, 518 F.3d 954, 958-61 (8th Cir. 2008) (en banc). Compare Georgia v. Randolph, 547 U.S. 103, 122-23 (2006) ("*physically present* inhabitant's *express refusal* of consent to a police search is dispositive *as to him*, regardless of the consent of a fellow occupant" (emphasis added)), with Illinois v. Rodriguez, 497 U.S. 177, 179 (1990) (consent to search residence by a third party — whom police "reasonably believe to possess common authority over the premises, but who, in fact, did not" have such authority — valid as to *sleeping* occupant), and United States v. Matlock, 415 U.S. 164, 171 (1974) (co-occupant's consent to conduct warrantless search valid as to *absent* co-occupant).

merits of a motion to suppress is 'virtually unassailable on appeal.'" United States v. Frencher, 503 F.3d 701, 701 (8th Cir. 2007) (citation omitted). As such, a typical reasonable person would understand that, by granting authorities' request to confirm he was the only person in the house, Defendant authorized the officers to check "every room, the sum of which is the house." United States v. Fleck, 413 F.3d 883, 892 (8th Cir. 2005). Quite plainly, this was the only way to verify Defendant was alone. See Payton, 445 U.S. at 589. Defendant's position that his consent only signaled permission to sweep the area immediately surrounding the seating area — and not the basement or other rooms in the house — is nonsensical. As such, the district court properly concluded that the police's protective sweep did not exceed the scope of Defendant's consent. See United States v. Meza-Gonzalez, 394 F.3d 587, 592 (8th Cir. 2005) ("Determination of consent necessarily involves judging the credibility of witnesses, a task generally left to the district court.").

As to the search of Defendant's house conducted after Defendant signed the consent form, Defendant maintains that he did not voluntarily consent despite signing the consent-to-search form. "[W]hether consent was voluntary is a question of fact," requiring "intensive inquiry." United States v. Lee, 356 F.3d 831, 834 (8th Cir. 2003). The totality of the circumstances governs whether consent is voluntary. United States v. Saenz, 474 F.3d 1132, 1137 (8th Cir. 2007). The Government bears the burden of establishing, by a preponderance of the evidence, that consent was voluntary, though, like all factual determinations, we review the district court's factual findings related to voluntariness for clear error. Id. The following factors are relevant to evaluating whether Defendant's consent was voluntary:

> 1) his age; 2) his general intelligence and education; 3) whether he was intoxicated at the time; 4) whether he consented after being informed of his Miranda rights; and 5) whether he was aware of his rights and protections due to previous arrests. Other relevant circumstances include: 1) the length of time the subject was detained; 2) whether the

officers acted in a threatening manner; 3) whether any promises or misrepresentations were made; 4) whether the subject was in custody or under arrest at the time; 5) whether the consent occurred in public; and 6) whether the subject was silent as the search was conducted.

Id. Though these "factors are valuable" and guide our analysis, we do not employ them mechanically. United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990).

Regarding Defendant's individual characteristics, Defendant is an adult, of apparently average intelligence (*e.g.*, the record reflects he answered officers' questions appropriately), who was not under the influence of alcohol, drugs, or otherwise impaired on the date in question. The fact Defendant acquiesced to speak with Detective Paulson about the Corn States Metal burglary after being advised of his Miranda rights also bears note. See Lee, 356 F.3d at 834 (recognizing that Miranda warnings "can lessen the probability that a defendant was subtly coerced" into consenting); see also United States v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003) (assessing voluntariness of consent and, therein, noting the defendant "generally appeared to cooperate with the officers during both the stop and the search"). Further, Defendant's prior convictions suggest he had an "increased awareness of his rights." Mancias, 350 F.3d at 805. Taken together, the record suggests Defendant was a "fully functioning adult who has a greater than average familiarity with the criminal justice system." Lee, 356 F.3d at 834.

The circumstances under which Defendant consented, on the whole, further bolster the conclusion Defendant voluntarily consented to the search. While several law enforcement officers were present, no evidence suggested the officers physically intimidated, threatened, or coerced Defendant in any manner. See id. at 835; see also United States v. Va Lerie, 424 F.3d 694, 709 (8th Cir. 2005) (en banc) (presence of two or three armed officers in a private room inside bus terminal did not negate

defendant's consent).  Nor did the evidence demonstrate authorities made any misrepresentations or promises to Defendant.  See United States v. Vera, 457 F.3d 831, 836 (8th Cir. 2006).  The record reflects Defendant signed the form promptly after officers first requested his consent and that they treated Defendant and his wife politely.  See United States v. Devore, 135 F. App'x 902, 904 (8th Cir. 2005).  Neither Defendant nor Mrs. Comstock objected when the officers conducted the search.[7] Defendant's wife was present.  See Lee, 356 F.3d at 835.  Authorities sought Defendant's consent in his home.  See, e.g., United States v. Biggs, 491 F.3d 616, 622-23 (7th Cir. 2007) (consent voluntary where defendant signed form in an abandoned factory parking lot, with four officers present, after being placed in the back of a police cruiser).  Moreover, in addition to signing the consent form, Defendant initialed the form to indicate officers had not made any "promises, threats, force, or coercion" to procure his consent.

On the other hand, a few circumstantial factors arguably aid Defendant's position.  First, when Defendant signed the consent form, he had been handcuffed for approximately two hours and narcotics officers had already viewed the marijuana grow.  But being handcuffed "does not preclude a finding of voluntariness." United States v. Becker, 333 F.3d 858, 861 (8th Cir. 2003); United States v. Harper, 466 F.3d 634, 644 (8th Cir. 2006) (fact police handcuffed defendant within seconds did not render consent invalid).  Indeed, we have expressly recognized that "even persons who have been arrested and are in custody can voluntarily consent to [a] search . . . ."  Chaidez, 906 F.2d at 382.  As to narcotics officers' pre-consent trip to the basement, we cannot see how this would compel Defendant to consent to an entire search of his residence and garage.  Defendant, of course, knew that WDMPD officers

---

[7] We recognize that Defendant and Mrs. Comstock testified to the contrary, but underscore that the district court credited the officers' testimony.  Finding the district court's ruling supported by substantial evidence, we defer to its credibility determinations.  See Williams, 521 F.3d at 908 ("This court is *highly deferential* to district court credibility determinations." (emphasis added)).

had found the marijuana grow and notified the narcotics team before the narcotics officers arrived at his house. Nothing in Detective Paulson and Detective Carlson's testimony indicates authorities had — nor that Defendant had any reason to believe they had — found any other contraband (*i.e.*, firearms or ammunition) in the basement prior to signing the form. In short, under the circumstances at bar, we are not persuaded that either the two hours Defendant spent handcuffed, or the fact the narcotics team viewed the marijuana grow in the basement, vitiate the effectiveness of Defendant's consent.

Second, the officers apparently stated that if Defendant refused to consent to the search they would obtain a search warrant, during which time Defendant would continue to be detained in handcuffs for an additional two hours.[8] Defendant does not challenge the veracity of the officers' statements, nor does he maintain the officers made them in a coercive manner. Further, Defendant failed to cite any authority for the proposition that the officers' statements were unduly coercive. Consequently, mindful of the fact-intensive nature of our inquiry, and the fact that no "per se rules" exist in this context, we decline to find that the officers' statements rendered Defendant's consent invalid. See Va Lerie, 424 F.3d at 710-11 (finding consent voluntary where "there was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice."). Under the totality of the circumstances, the numerous facts supporting a finding that Defendant voluntarily consented far outweigh those to the contrary. See United States v. Drayton, 536 U.S. 194, 201, 207 (2002) ("for the most part *per se* rules are inappropriate in the Fourth Amendment context;" instead, the "totality of the circumstances must control.").

---

[8] Because the officers' suppression hearing testimony is not to the contrary, and Defendant and Mrs. Comstock's respective testimony was consistent in this regard, we assume the narcotics officers made these statements.

Thus, the district court's conclusion that Defendant signed the consent-to-search form voluntarily is not clearly erroneous.[9] See Castellanos, 518 F.3d at 969.

## III.

Defendant also argues that the district court erred in applying the ACCA sentencing enhancement and, thus, asks us to remand for resentencing. Specifically, Defendant maintains: (1) his convictions for operating a vehicle under the influence (OWI) are not predicate ACCA prior convictions; and (2) even if an OWI conviction can constitute a "violent felony" for ACCA purposes in some cases, the Government failed to properly evidence that Defendant's OWI convictions were, in fact, ACCA "violent felonies." The Government counters that the ACCA enhancement applies because: (1) pursuant to Eighth Circuit authority Defendant's Iowa OWI felonies each constitute a "violent felony" under the ACCA; and (2) regardless, aside from the OWI offenses, Defendant has three other previous ACCA predicate convictions. "This court reviews de novo the finding that a defendant's prior conviction constitutes a violent felony" for ACCA purposes. United States v. Vincent, 519 F.3d 732, 733 (8th Cir. 2008).

During the pendency of this appeal, the Supreme Court "overruled our interpretation of § 924(e)(1) and held driving under the influence of alcohol is not a violent felony as defined in the [ACCA]." United States v. Heikes, 525 F.3d 662, 664 (8th Cir. 2008); see United States v. McCall, 439 F.3d 967, 972 (8th Cir. 2006) (en banc), overruled by Begay v. United States, 128 S. Ct. 1581 (2008). Such a change

---

[9] Having concluded authorities did not violate Defendant's Fourth Amendment rights, we need not address the Government's alternative argument that Defendant's suppression motion was properly denied in light of the "inevitable discovery" doctrine. See United States v. Pruneda, 518 F.3d 597, 604 (8th Cir. 2008).

in the law while a defendant's case is pending triggers plain error review. See Heikes, 525 F.3d at 664. Fed. R. Crim. P. 52(b) dictates that we may rectify an error if the error is plain, affects a defendant's substantial rights, *and* seriously affects the fairness, integrity, or public reputation of judicial proceedings. See id. Though Defendant's OWI convictions are not ACCA "violent felonies," Defendant is not entitled to plain error relief because he has at least three other qualifying ACCA predicate offenses — *i.e.*, felony delivery of cocaine, felony distribution of narcotics, and attempted burglary. See 18 U.S.C. § 924(e)(1). As such, the district court's error did not affect Defendant's substantial rights. See United States v. Barnett, 410 F.3d 1048, 1052 (8th Cir. 2005); cf., e.g., Heikes, 525 F.3d at 664 (holding plain error relief warranted under Begay where defendant's criminal history included convictions for three prior OWI offenses and one misdemeanor assault offense).

For the forgoing reasons, we **AFFIRM** the district court's judgment.