# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3611

_____

United States of America

*Plaintiff - Appellee*

v.

Robert Allen King

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 20, 2016
Filed: April 14, 2017

_____

Before WOLLMAN, SMITH,[1] and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury convicted Robert Allen King of possession with intent to distribute 50 grams or more of actual methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and

---

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

(b)(1)(A). The district court[2] sentenced King to 180 months' imprisonment, followed by five years of supervised release. King appeals his conviction and sentence. He asserts the following trial errors: (1) the district court erred in admitting a cooperation agreement into evidence at trial; (2) the district court erred by not ordering a mistrial based on his defense counsel's conflict of interest as a potential witness; and (3) sufficient evidence supports his public-authority defense. King also asserts the following sentencing errors: (1) the district court erred in denying his motion for retesting the purity of the methamphetamine and his motion for reconsideration of the denial of that motion; (2) the district court erred in applying an obstruction-of-justice enhancement; and (3) the district court erred in denying him an adjustment for acceptance of responsibility. For the reasons stated below, we affirm.

## I. *Background*

In 1996, King pleaded guilty to conspiring to distribute and possess with intent to distribute cocaine. He served a total of 168 months' imprisonment for this federal drug-trafficking offense. After his release from prison in 2012, King resumed selling drugs. Law enforcement discovered and investigated his new enterprise.

On July 10, 2013, the Southwest Hennepin Drug Task Force (SWHDTF) executed search warrants at King's home and at the home of his supplier, Marlon Bettencourt. The SWHDTF discovered a gallon-size plastic bag with methamphetamine residue at King's home and heroin and other drugs at Bettencourt's home. To avoid charges, King cooperated with law enforcement. On July 15, 2013, King and his longtime attorney, Allan Caplan, met with Sergeant Brady Sweitzer and Officer Todd Hinz of the SWHDTF. The SWHDTF enlisted King as a confidential reliable informant (CRI). King signed a cooperation agreement with the Hennepin County Sheriff's Office (HCSO). That cooperation agreement included a list of rules

---

[2]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

for King to follow ("Attachment B"). In Attachment B, King agreed "not to participate in any investigations or any criminal activities unless the investigation is being directly supervised by an investigator of the HCSO"; "not to break any laws or commit any crimes while working for the HCSO"; and "not [to] use any illegal drugs" or "handle any illegal drugs unless specifically authorized to do so by the HCSO." SWHDTF officers reviewed the cooperation agreement with King, and King initialed each rule and signed the agreement. He also indicated his understanding "that the task force may terminate this agreement at any time" and that "[v]iolation of any of the above enumerated provisions will be grounds for immediate removal as a Cooperating Individual and the possible filing of criminal charges." In addition to Attachment B, the cooperation agreement included a few other documents, such as a signature page and a biographical information sheet.

For the next two months, King worked as a CRI for the SWHDTF. He made two controlled deliveries of cash, participated in a controlled buy of cocaine, and arranged for the takedown of a load car. King's status as a CRI ended after the takedown of the load car carrying 20 pounds of methamphetamine in September 2013. After this investigation concluded, "it was made clear to King that his status as a CRI was terminated." King told the SWHDTF officers that he was moving to Spokane, Washington, with his girlfriend to work in a friend's computer-software business.

King, however, did not move at that time to Spokane, Washington.[3] On October 22, 2013, at 2:20 a.m., King called Officer Hinz and told Officer Hinz that he wanted to provide information about a heroin dealer staying in a Minneapolis hotel who was selling heroin and possessed a handgun. King told Officer Hinz that he had learned the information when "he had taken somebody over to the hotel presumably

_____

[3]King and his girlfriend did not move to Spokane, Washington, until December 30, 2013.

-3-

to pick up heroin." Officer Hinz "explained to King that his status as a CRI was complete" and "asked him why he was in Minneapolis" because King had previously told Officer Hinz that he was moving to Washington. According to Officer Hinz, King replied "that he was back in town for a couple of days taking care of some things. He then said that he didn't like people selling heroin and to consider his information as a 'Freebie.'"

In January 2014, King, with the aid of attorney Caplan, sought to resume work as a drug informant.[4] He offered to provide information regarding heroin dealers as third-party cooperation on behalf of his girlfriend, who was facing revocation of her probation in Hennepin County. The Hennepin County Attorney's office, however, declined King's proposed third-party cooperation offer. Thereafter, King stopped contacting the SWHDTF officers.

After learning that King had resumed his own methamphetamine trafficking in December 2013 or January 2014, the special investigations unit of the Richfield Police Department began investigating him. A confidential informant told Richfield officers that King was selling methamphetamine from his home in south Minneapolis. After determining that King no longer worked as an informant for Hennepin County, Richfield Police Officer Dustin Schwarze obtained a search warrant for King's home in February 2014.

The Minneapolis Special Weapons and Tactics team (SWAT) executed the search warrant during the early morning hours. SWAT entered the house and identified itself. In reaction, King began throwing methamphetamine and other items out of his bedroom window. Officer Schwarze saw King open the window and throw the methamphetamine out using both hands. Although Officer Schwarze yelled at

---

[4]King and his girlfriend returned to Minnesota in January 2014.

King to show his hands and stop, King ignored this command and continued throwing the drugs out of the window. King stopped only when SWAT apprehended him.

Law enforcement recovered large, unpackaged crystalline chunks of methamphetamine, packaged methamphetamine, and other evidence from the roof, sidewalk, and window sill of King's home. Officers recovered additional methamphetamine in King's bedroom, as well as packaging materials and over $4,500 in cash.

SWHDTF officers interviewed King after his arrest. In that recorded interview, King admitted owning the methamphetamine found at the house. He said that he had been selling about a pound per week. King said that when he heard SWAT enter and announce its presence, he tried to dispose of the methamphetamine by throwing it out of his bedroom window. After the officers stopped recording the interview, King told them that he wanted to cooperate to avoid charges or perhaps receive a lower sentence, if charged. King never claimed that he thought that he was still working as an informant.

The Richfield Police Department told King and attorney Caplan that it would not work with King as a cooperator. King then had Caplan contact the Drug Enforcement Agency and the United States Attorney's Office. Caplan was told that King would not be permitted to cooperate in the case. After his indictment, King met with Caplan, who suggested a public-authority defense strategy. King thereafter claimed that he had "total immunity" for selling drugs based on a cooperation agreement with law enforcement.

At trial, the jury rejected King's public-authority defense and found him guilty. Prior to sentencing, King moved to retest the methamphetamine,[5] but the district court ultimately denied that motion, as well as King's subsequent motion for reconsideration. The presentence investigation report (PSR) stated that King was "responsible for a quantity ranging from 175.019 to 205.235 grams of methamphetamine (actual)" and calculated a base offense level of 32. At sentencing, the Minnesota Bureau of Criminal Apprehension (BCA) chemist who tested the methamphetamine confirmed that amount, and the district court accepted it. After applying an obstruction-of-justice enhancement and denying an adjustment for acceptance of responsibility, the district court calculated a Guidelines range of 188 to 235 months' imprisonment. After hearing argument from counsel, the district court sentenced King to 180 months' imprisonment, followed by five years of supervised release.

## II. *Discussion*

King appeals his conviction and sentence. He asserts that three trial errors and three sentencing errors warrant reversal.

## A. *Trial*

First, King asserts the following trial errors: (1) the district court erred in admitting a cooperation agreement into evidence at trial; (2) the district court erred by not ordering a mistrial based on his defense counsel's conflict of interest as a potential witness; and (3) sufficient evidence supports his public-authority defense.

---

[5]The methamphetamine was originally tested for purity in August 2014; thereafter, a superseding indictment was filed on September 11, 2014. The drug charged remained the same, but the statutory minimum sentence of imprisonment for the offense increased to ten years because of the "actual" methamphetamine seized from King's home—over 150 grams.

### 1. *Cooperation Agreement*

King first challenges the district court's admission of Attachment B of the cooperation agreement. At trial, the government moved to introduce Attachment B. King's counsel initially objected, arguing that it was "not the entire agreement." The court asked the government to "lay some more foundation." The government then asked King whether he was "given a single page that had all the rules that [he] had to follow on it," and King replied, "I was given a packet of papers." The government then clarified that it was "asking about the rules that [King] w[as] required to follow." King replied, "This is one piece of the packet, yes." The government again moved to admit Attachment B, and King's counsel replied, "No objection."

On appeal, King argues that the district court abused its discretion by permitting the government to establish the details of King's written cooperation agreement by submitting a single page of a multiple-page document and supplementing that evidence with testimony from law enforcement officers based on their "foggy" recollection about the remainder of the agreement.

In response, the government points out that King's counsel stated that she had "[n]o objection" to Attachment B and argues that King waived any claim regarding its admission. King counters that his counsel never withdrew the original objection but instead just never "reasserted" that objection after the government laid more foundation.

We have previously "found pretrial objections waived when an appellant's counsel *affirmatively stated* 'no objection' at trial to the admission of evidence previously sought to be suppressed." *United States v. Comstock*, 531 F.3d 667, 675 (8th Cir. 2008) (quoting *United States v. Gonzalez–Rodriguez*, 239 F.3d 948, 951 (8th Cir. 2001)). For example, in *Comstock* we held that the "[d]efendant 'consciously and intentionally waived any objection' to the district court's receipt of the evidence at issue in his pretrial suppression motion" when defense counsel responded "no

objection" "each time the Government moved to admit evidence that [d]efendant's pretrial motion sought to suppress." *Id*. (quoting *United States v. Wedelstedt*, 589 F.2d 339, 345–46 (8th Cir. 1978)).

We find the present case similar to *Comstock*. King's counsel affirmatively stated "no objection" to the admission of the *same evidence* that counsel initially sought to exclude. As a result, King unconditionally, consciously, and intentionally waived any objection to the district court's admission of Attachment B.

### 2. *Counsel as Potential Witness*

King next argues that the district court erred by failing to declare a mistrial *sua sponte* when it became clear at trial that his trial counsel would need to testify in response to the testimony of King's prior counsel, Allan Caplan.

At trial, King called Caplan as a witness. Caplan testified that King entered the cooperation agreement with the SWHDTF so that King would not be charged for drug trafficking that he conducted "before" the agreement was reached. Caplan stated that the cooperation agreement did not give King permission to sell drugs on his own. He testified that if King had such an agreement, Caplan, as King's attorney, would have contacted the SWHDTF as soon as he found out about the arrest and tried to enforce the agreement. Instead, Caplan stated that he worked with King in an attempt to arrange for King to cooperate in his new case to reduce his charges or his sentence. King's trial counsel did not ask Caplan about prior statements that Caplan might have made that were inconsistent with his trial testimony.

After Caplan's testimony was complete, and after a 15-minute break, King's trial counsel told the district court that she had no more witnesses. The government then indicated that it would call rebuttal witnesses. But before the government put on its first witness, King's trial counsel told the court, out of the jury's presence, "I have never faced this experience in 23 years, but the witness I just called did not say

-8-

anything on the stand that I had expected him to. He told me something very different in my meeting with him Saturday." King's counsel explained that Caplan had, prior to trial, offered to corroborate King's testimony that he worked for the authorities when he was arrested. King's trial counsel expressed concern that she might have to become a witness herself to impeach Caplan's testimony. The court allowed the government to proceed with its witnesses, advising King's counsel that the court could take up the issue during surrebuttal, if any.

King's trial counsel, however, never recalled Caplan to ask him about any prior statements. Nor did she allege during trial that any error occurred regarding Caplan's testimony or move for a mistrial based on Caplan's testimony. It was not until sentencing that King moved for a new trial based on Caplan's allegedly inconsistent testimony. The district court denied the motion.

King now argues that the district court erred by not resolving whether his trial counsel was disqualified after Caplan, his former attorney, purportedly testified differently than his prior statement to trial counsel. According to King, his trial counsel would have had to testify as a defense rebuttal witness as to her recollection of that prior statement. King asserts that although his trial counsel brought this conflict to the court's attention after the defense rested, the court never resolved the conflict. King contends that by failing to further address the issue, his trial counsel's representation fell below an objective standard of reasonableness and that if counsel had followed up on this issue, she could have requested a mistrial.

To the extent that King asserts that he received ineffective assistance of counsel, we decline to consider this claim, as King's case is not exceptional and should be raised in a habeas corpus action. *See United States v. Golliher*, 820 F.3d 979, 984 (8th Cir. 2016) (noting that we review *Strickland* claims on direct appeal only in exceptional cases).

And, because trial counsel never confronted Caplan with his prior inconsistent statements pursuant to Federal Rule of Evidence 613(b), trial counsel could not have testified that Caplan made prior inconsistent statements to her. *See* Fed. R. Evid. 613(b) ("Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires."). At no time did King re-call Caplan to ask him about his prior statements, nor has King argued that any error occurred regarding Caplan's testimony. At sentencing, King moved for a new trial based on Caplan's allegedly inconsistent testimony, but the district court found that Caplan testified credibly and that contrary statements were not even plausible. On appeal, King has not identified any trial error that occurred regarding Caplan's testimony.

Accordingly, we hold that the district court committed no error in not declaring a mistrial *sua sponte*.

### 3. *Public-Authority Defense*

King's final allegation of trial error is that sufficient evidence exists to support his public-authority defense. King admits that he was guilty of possessing the methamphetamine and that it was at least 50 grams of actual methamphetamine. He contends that the real trial issue was whether he had public authority to possess the methamphetamine in question. He concedes that the burden of proof for this affirmative defense was on him, but he argues that his burden of proving the defense was not as high as the government's burden of proof. He argues that sufficient evidence exists that he had a reasonable belief that he was permitted to possess the methamphetamine under the authority of law enforcement.

During trial, King moved the district court to enter judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 at the close of the government's case, and the district court denied the motion. He did not renew his motion for

-10-

judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, at the close of all evidence.

We hold that King's claim fails whether we review de novo or under a plain-error standard. *Compare United States v. Timlick*, 481 F.3d 1080, 1082 (8th Cir. 2007) (providing motion for judgment of acquittal at close of government's evidence preserves argument for appeal); *United States v. May*, 476 F.3d 638, 640 (8th Cir. 2007) (same); *United States v. Vinton*, 429 F.3d 811, 815 (8th Cir. 2005) (same), *with United States v. Wadena*, 152 F.3d 831, 853 (8th Cir. 1998) (providing failure to renew motion for judgment of acquittal at the close of all evidence results in plain-error review); *Edwards v. United States*, 333 F.2d 588, 589 (8th Cir. 1964) (same). King admits that he was guilty of possessing the methamphetamine and that it was at least 50 grams of actual methamphetamine. He has not argued on appeal that the government failed to present sufficient evidence to convict him of possession of methamphetamine; instead, his argument is that he produced sufficient evidence of his affirmative defense. Even King admits that "[h]e asserted a public authority affirmative defense, and apparently the jury . . . did not believe the defense." This defense turned on factual issues within the jury's purview. Accordingly, we reject King's argument that we should vacate his conviction based on his public-authority defense.

## B. *Sentencing*

King next asserts the following sentencing errors: (1) the district court erred in denying his motion for retesting the purity of the methamphetamine and his motion for reconsideration of the denial of that motion; (2) the district court erred in applying an obstruction-of-justice enhancement; and (3) the district court erred in denying him an adjustment for acceptance of responsibility.

## 1. *Retesting of Methamphetamine*

The methamphetamine seized from King's home was collected in eight packages that the government offered as exhibits at trial. Exhibits 16 and 17 contained methamphetamine found in sealed packages in King's bedroom. Exhibit 7 was a sealed package of methamphetamine found in a laptop bag that King had thrown into the front yard. Exhibit 5 was methamphetamine contained in a package that had been torn open and was found on the front sidewalk. Exhibit 15 contained loose methamphetamine that was found on and around the window sill in King's bedroom. Exhibits 8, 10, and 11 contained loose methamphetamine that was collected from the first-floor roof outside King's bedroom. The eight drug exhibits were tested by the BCA forensic science laboratory in August 2014. All eight drug exhibits seized from King's home were found to contain methamphetamine. The four largest exhibits (Exhibits 10, 11, 15, and 16) were further tested for purity and found to be 92 and 94 percent pure and to contain 175.019 to 202.235 grams of actual methamphetamine. The PSR reflected this drug quantity and recommended a base offense level of 32 pursuant to U.S.S.G. § 2D1.1(c)(4).

Prior to sentencing, King moved to have the four packages of methamphetamine that the BCA chemist had previously tested for purity retested by an independent laboratory. He asserted that the BCA chemist had "not tested the samples in a uniform manner."

The district court ordered that King provide it with "supplemental information." It ordered King to address four issues: (1) the fact that the drugs were in evidence as trial exhibits; (2) the untimeliness of King's sentencing submissions, which "were due on August 28, 2015, with no further extensions to be granted"; (3) "why supplemental testing could not have been requested in advance of trial" given that discovery was ordered in July 2014; and (4) a "non-speculative basis to believe that the testing conducted by the [BCA] chemist who testified at trial is not reliable." The district court directed that "[u]nless the defendant files a supplemental

-12-

memorandum by September 22, 2015, the motion will be denied." On September 29, 2015, after receiving nothing further from King, the district court denied the motion.

King moved for reconsideration of his retesting motion. King's counsel explained that she "did not address the Court's Order requiring supplemental information because she was in trial when the Government filed its objections and when the Court issued the Order." Counsel then addressed the four issues set forth in the district court's prior order. The district court denied King's motion for reconsideration.

At sentencing, King asserted for the first time that "one of the samples . . . . is pure cut, meaning it's not methamphetamine at all. It's literally just a powdered substance that's used to mix with methamphetamine to reduce its purity." The government then called the BCA chemist to testify about her testing of the methamphetamine. The chemist explained the drug-testing process and confirmed that the four samples were each determined to be between 92 and 94 percent pure and that "the range of actual methamphetamine was 175.019 grams to 205.235 grams." The chemist also testified that the type of "cut" that King claimed to have added to most of the methamphetamine was not present in the four samples that she tested for purity. Following the chemist's testimony, King's counsel made no further argument regarding the drug quantity and rested on King's prior submissions.

The district court concluded that the PSR accurately reflected the drug quantity, as confirmed by the chemist's testimony. The court also cited King's testimony "that he was selling a pound of methamphetamine a week," which further supported the drug-quantity finding. Based on the drug quantity, the district court calculated a base offense level of 32.

On appeal, King argues that the district court erred in denying his motion for retesting the purity of the methamphetamine and his motion for reconsideration of the

denial of that motion. According to King, he specifically reserved the right to contest the purity and quantity for sentencing purposes despite his stipulation at trial that the drugs in question were at least 50 grams of actual methamphetamine. King admits that he missed the deadline to file a supplemental brief on his motion for retesting. He bases his argument on a Confrontation Clause violation. King contends that although the district court has the discretion to deny an untimely motion, the district court abused its discretion because denying the motion undermined his ability to confront the evidence against him in a meaningful way.

As King concedes, a district court has discretion to deny an untimely motion. *See United States v. Zidar*, 178 F. App'x 673, 676 n.2 (9th Cir. 2006) ("We review a district court's decision to deny an untimely motion for abuse of discretion."). Furthermore, we review for an abuse of discretion a district court's denial of a motion for reconsideration. *United States v. Luger*, 837 F.3d 870, 875 (8th Cir. 2016).

We hold that the district court did not abuse its discretion in denying King's untimely motions because the district court had already given King ample opportunity to raise his motion for retesting in a timely manner. The district court gave King a four-week extension of time to file his sentencing materials; they were due on August 28, 2015. But King did not file his sentencing memorandum until August 31, 2015, and he did not file his motion for retesting until September 5, 2015. Although that motion was already untimely, the district court gave King until September 22, 2015, to file a supplemental memorandum in support of his motion for retesting. King did not file a supplemental memorandum during that time, and the district court denied his motion for retesting on September 29, 2015. King did not file the motion for reconsideration until October 7, 2015.[6]

_____

[6]Even if we were to address the substance of King's claim, his assertion that his motion for retesting was based on a Confrontation Clause rationale is without merit. "We have held that the admission of hearsay during sentencing proceedings does not violate a defendant's rights under the Confrontation Clause." *United States*

## 2. *Obstruction of Justice*

King next contests the district court's imposition of an obstruction-of-justice enhancement. The PSR did not recommend it, but the government requested application of the enhancement based on King's testimony at trial. At sentencing, the government argued that King's "defense is a lie." In support of this argument, the government asked the court to

> recall that Mr. King testified about when he was working as a CI on the Lagunas matter. Law enforcement found a small amount of methamphetamine shoved in a back seat of a car that he had rented, and they confronted him about it. And when they did that, he lied to them. He said, oh, that's not my meth. I don't know anything about it. If he had permission, he wouldn't have had to lie about it. It would have been, oh, you know, that's what I got to do to stay in the game, officer; instead he lied about it.

> When law enforcement showed up at his house, he threw the drugs out the window. If he had permission to sell drugs, there was absolutely no need for him to get rid of them, which is what he testified he said he was doing.

> Additionally, . . . . at the time of his arrest, he did not say anything to law enforcement about the fact that he was authorized to be selling these drugs. Instead what he did is tried to cooperate again, and he would not need to have cooperated again if this is all part of his lawful activity that he was engaged in.

King's counsel replied that the officers' behavior during the questioning of King indicated that King was cooperating with law enforcement all along. Counsel first made "clear" that she was "not asking for a retrial on this" because "[t]he jury found him guilty." The court concluded that the enhancement applied, stating, "The

---

*v. Pepper*, 747 F.3d 520, 525 n.5 (8th Cir. 2014).

-15-

obstruction is worth considering because the testimony that the defendant gave was unnecessarily perjurious. The testimony of the defendant took unfair and unreasonable advantage of this Court's determination that the defendant's prior federal drug conviction would not be part of the trial." Specifically, King had the 1996 drug-trafficking conviction for which he served a total of 168 months' imprisonment. During trial, the government did not cross examine him about that prior conviction. The court pointed out that King

said, for example, with respect to the methamphetamine in the trunk of his car, the defendant's testimony was that he was surprised by being there. That's fine. That's consistent with his defense that he didn't know it was there.

But then he said, but he was also a little fearful because, quote, "I didn't know what was going to happen because I had never been in that actual situation with law enforcement before in all my time of working with them. It just had never happened before."

And throughout the testimony, Mr. King gave the impression that he was a long-time drug informant, which he does have a history of getting arrested and working it off. But the assertions that he was given carte blanche complete immunity to sell what he wanted, keep the money, and so on, were not supported by any credible testimony.

So the testimony that he's been cooperating since 1987. So here this is on page 11 of the trial transcript to the question:

"What promise did they give you?" The defendant answered, "I would get total immunity, and I would walk away." Well, that was untrue. But then another question:

"And you mentioned a minute before that you had cooperated with law enforcement before, is that correct?"

Answer: "Yes, I have. Since 1987 the first time.

-16-

Question: I'm sorry?

Answer: The first time in 1987.

Question: About how many times?

Answer: I had an ongoing agreement with the BCA, the Minnesota Bureau of Criminal Apprehension from 1987 to about 1992. I assisted them on probably 20 investigations responsible for many loads of dope, ten kilos of cocaine.

Question: Any other organization you worked for besides the BCA since 1987?

Answer: BCA, DEA, U.S. Marshals. I provided assistance to U.S. Marshals in a fugitive apprehension in California in 1993. I've worked with the DEA. I was assigned by the DEA in 2009."

All of that is designed to leave the impression that the defendant has been a helper of law enforcement over all these years, whereas in truth and in fact, and as he well knew, he had spent some 168 of those months in federal custody related to his prior drug charge.

So going to trial is his absolute right. There's no difficulty at all going to trial. And there's no obstruction in going to trial. But testifying falsely, and we're not even talking about the post-conviction affidavit submitted by the defendant, which contains assertions about the drug purity that are simply not plausible given the testimony that we've had here from the chemist. Or common sense, for that matter.

The defendant testified that he had a college GPA of 3.97. I was very curious to see that borne out in the presentence investigation report, but there's no indication of any college at all, let alone college with a GPA of 3.97 in the PSR. And there were no formal or informal requests to correct that. So that seems to have been an attempt to begin the testimony with something that would impress the jury. So those are the factors that are of concern to the Court. Not the fact that he went to trial.

-17-

It's not even that he testified about his understanding with the government about cooperation. It would even be one thing to testify I thought I had this deal. I thought Mr. Caplan told me I had absolute immunity, and I could do whatever I want. Sell pounds a week, do whatever I wanted. You know, maybe I'm wrong about that, but that was my legitimate understanding. That's one thing.

But in the details that I've talked about, the testimony seemed to go beyond that defense . . . .

(Emphases added.)

The district court concluded that King had "attempted to obstruct justice" and, after applying that adjustment, found a total offense level of 34.

On appeal, King argues that none of the grounds that the district court identified as a basis for obstruction of justice justify application of the enhancement. King contends that, even assuming the court raised valid concerns about his testimony, they still do not justify the enhancement because "it cannot be sufficient to find that Mr. King obstructed justice merely because the district court disbelieved his testimony or found it to be misleading."

"We review the district court's factual findings underlying an adjustment for obstruction of justice for clear error, giving great deference to the sentencing court's determination." *United States v. Brown*, 539 F.3d 835, 839 (8th Cir. 2008). Section 3C1.1 of the Guidelines states:

If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of

-18-

conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. "Application note 4 to § 3C1.1 is a non-exhaustive list of examples of the types of conduct to which the enhancement applies." *United States v. Edwards*, 820 F.3d 362, 365 (8th Cir. 2016). "[C]ommitting, suborning, or attempting to suborn perjury" constitute types of conduct to which the enhancement applies. U.S.S.G. § 3C1.1 cmt. n.4(B). A district court may apply the two-level increase under § 3C1.1 if it "finds by a preponderance of the evidence that a defendant committed perjury, *i.e.*, that he willfully testified falsely as to a material matter." *United States v. Reid*, 827 F.3d 797, 801 (8th Cir. 2016); *see also United States v. Waters*, 799 F.3d 964, 974 (8th Cir. 2015) ("Perjury occurs when a witness 'gives false testimony concerning a material matter with the wilfull intent to provide false testimony.'" (quoting *United States v. Petrovic*, 701 F.3d 849, 859 (8th Cir. 2012)).

"'Material' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 cmt. n.6. Even if "the district court neglect[s] to address whether the false testimony was material[,] . . . this court has affirmed a finding of obstruction of justice where the finding is 'strongly supported by the record.'" *United States v. McDonald*, 826 F.3d 1066, 1071 (8th Cir. 2016) (quoting *United States v. Nshanian*, 821 F.3d 1013, 1019 (8th Cir. 2016)). The false testimony or statements need not have caused the government actual prejudice to be material. *See Edwards*, 820 F.3d at 365–66 (holding district court properly applied obstruction of justice enhancement even though the defendant's actions did not actually prejudice government; although one example given in application notes to Sentencing Guidelines provided that a defendant had to actually obstruct or impede an investigation for the obstruction of justice enhancement to apply, two other examples, which were relevant to defendant's

conduct, involving an attempt to suborn testimony or influence a co-defendant, permitted application of the enhancement based only on an attempt to obstruct justice, regardless of whether the attempt was successful).

"The enhancement does not apply when the false testimony is simply due to the defendant's 'confusion, mistake, or faulty memory.'" *Waters*, 799 F.3d at 974 (quoting U.S.S.G. § 3C1.1 cmt. n.2). "Before imposing an enhancement under § 3C1.1, the district court 'must review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice.'" *United States v. Whiting*, 522 F.3d 845, 850 (8th Cir. 2008) (quoting *United States v. Dunnigan*, 507 U.S. 87, 95 (1993)). "To apply the adjustment, the district court must make a finding of perjury that is independent of the jury's verdict." *Reid*, 827 F.3d at 801.

Here, the district court identified a false statement that King made at trial and made the independent finding that King's testimony "was unnecessarily perjurious." *Cf. Whiting*, 522 F.3d at 850. The court identified as "untrue" King's statement "I would get total immunity, and I would walk away" when asked what law enforcement promised him. This finding of falsity is supported by King's conduct when law enforcement executed the search warrant at his home. King threw the drugs out of the window and, when questioned, never mentioned that he was authorized to sell drugs.

We conclude that district court's finding that King committed perjury at trial was not clearly erroneous.[7] In making its decision, the district court stated that King did not obstruct justice by "going to trial" but did obstruct justice by "testifying

---

[7]Because we have identified one of the district court's findings that supports the obstruction-of-justice enhancement, we need not address the other grounds that the district court cited in support of the enhancement, such as whether King gave a false impression that he "has been a helper of law enforcement" over the last 30 years and lied when he testified that he had a college GPA of 3.97.

falsely." The court found that King's "testimony seemed to go beyond [the public authority] defense." Although the district court did not discuss the materiality of the false testimony that it identified, we conclude that the record strongly supports such a finding. *See McDonald*, 826 F.3d at 1071. Had the jury believed King's testimony that the district court identified as false, such belief would have influenced the jury's determination of whether King was acting under public authority in possessing the methamphetamine. *See* U.S.S.G. § 3C1.1 cmt. n.6.

### 3. *Acceptance of Responsibility*

Finally, King argues that the district court erred in denying him an adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. According to King, he accepted responsibility for his actions and actually assisted the government prior to his arrest. He points out that he confessed to possessing the drugs and stipulated to the quantity and purity for trial purposes. He also maintains that he conveyed genuine remorse for his actions by confessing to the possession of the drugs.

Section 3E1.1 of the Guidelines provides, "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a).

> *This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.* Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. *In rare situations* a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. *This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt* (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted

-21-

responsibility will be based primarily upon pre-trial statements and conduct.

*Id*. cmt. n.2 (emphases added); *see also United States v. Petruk*, 836 F.3d 974, 977 (8th Cir. 2016) ("It is a 'rare situation' where a defendant who contests his guilt at trial can meet his burden to clearly demonstrate acceptance of responsibility."(quoting *United States v. Spurlock*, 495 F.3d 1011, 1014 (8th Cir. 2007))).

Where a defendant raises a public-authority defense, testifies at trial, and the district court makes its own findings at sentencing that the defendant committed perjury, a district court does not clearly err in denying acceptance of responsibility. *See, e.g.*, *United States v. Warren*, 454 F.3d 752, 762 (7th Cir. 2006) (holding district court did not clearly err in denying defendant a downward sentence adjustment for acceptance of responsibility, given that defendant received sentence enhancement for obstruction of justice, failed to explain what was extraordinary about his case, and put the government to its burden of proof by maintaining that his conduct was not unlawful because he was acting as confidential informant); *United States v. Rivera*, 86 F. App'x 922, 924 (6th Cir. 2004) (holding defendant clearly maintained his public-authority defense to being a felon in possession of a firearm, despite overwhelming evidence to the contrary, and thus was not entitled to sentencing reduction for acceptance of responsibility).

Here, the district court made specific findings at sentencing that King lied when he testified that he was promised total immunity from drug dealing. Although there may "be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply," "[c]onduct resulting in an enhancement under § 3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1 cmt. n.4. We therefore hold that King has not shown that his case is "extraordinary," especially considering that King put the government to its burden of proof at trial.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____